872 F.2d 1035

**BLINDED VETERANS ASSOCIATION**

v.

**BLINDED AMERICAN VETERANS FOUNDATION, Appellant.**

No. 88–7107.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 6, 1989.

Decided April 11, 1989.

As Amended April 21, 1989.

---

**2.** The Authority's holding that proposals on how employees are paid are negotiable is inapplicable to the instant case. *Federal Employees Metal Trades Council, AFL–CIO, and Department of the Navy, Mare Island Naval Shipyard, Vallejo, California,* 25 F.L.R.A. (No. 31) 465 (February 2, 1987) (hand delivery versus direct deposit of paycheck). OEA's proposal does not involve the mechanism for delivery of employees' salaries, but rather how employees spend their money.

Raphael V. Lupo, Washington, D.C., with whom Donna M. Tanguay was on the brief, for appellant.

Irving R.M. Panzer, Washington, D.C., for appellee.

Before RUTH BADER GINSBURG, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

The Blinded Veterans Association (BVA or the Association) sought to enjoin the Blinded American Veterans Foundation (BAVF or the Foundation) from using the words "blinded" and "veterans" in its name and from using the initials "BAV" as an acronym. BVA contended that BAVF's name was confusingly similar to BVA's and would deceive the public into thinking BAVF was BVA. The district court agreed, concluding that BAVF had infringed BVA's trademark. That court therefore enjoined BAVF from using the name "Blinded American Veterans Foundation," the initials "BAV" or "BAVF," and "any name in which the words 'veterans,' and 'blind' or 'blinded,' are employed as noun and modifying adjective." *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 680 F.Supp. 442, 446 (D.D.C.1988). We hold that BVA's name is not a protectable trademark because the term "blinded veterans" is generic. BVA, however, may be entitled to protection against BAVF's passing itself off as BVA. We therefore vacate the judgment of the district court and remand for consideration of BVA's "passing off" claim.

## I.

Appellee Blinded Veterans Association is a nonprofit organization founded in 1945 by a group of blinded World War II veterans. BVA was incorporated in New York in 1947 and was chartered by an act of Congress in 1958. *Id.* at 443. The Association has used the initials "BVA" as its logo since 1945. *Id.* at 445. BVA provides services for veterans who originally could see but have lost their sight, even if their blindness is not service-connected. *Id.* at 443. The Association's services and activities for its constituency include arranging for rehabilitation and job training and placement, advising on claims for government benefits, testifying before Congress, joining litigation likely to benefit blinded veterans, sponsoring events to publicize the plight of blinded veterans, and publishing a newsletter, the "BVA Bulletin," containing information of interest to blinded veterans. *Id.* at 444.

BVA has approximately 6,500 members; it employs sixteen persons on its head-

quarters staff in Washington, D.C. and eight field representatives outside the nation's capital. *Id.* The Association's annual operating budget is just under $1.5 million. Seventy percent of BVA's income represents contributions derived from direct mail solicitations; to gain these contributions, BVA mails more than four million solicitations per year. *Id.* The remainder of BVA's income comes from membership dues and contracts with the Department of Labor and the Veterans Administration to provide rehabilitation and employment services for blinded veterans. *Id.* at 443–44.

Appellant BAVF is a nonprofit District of Columbia corporation founded in September 1985 by three former officials of BVA.[1] Aside from the three founders, who also serve as BAVF's officers and directors (and who are employed full-time elsewhere), BAVF has no "members" or paid employees. *Id.* at 444. The Foundation maintains no office of its own; it operates from "free 'desk space' in a local consulting firm's office." *Id.* At the time of trial, the Foundation had a balance of approximately $10,000 in a bank, "the name of which [BAVF's] president could not then remember." *Id.*

BAVF's charter defines the Foundation's purpose broadly as assisting veterans with "sensory disabilities such as visual impairment, hearing impairment, speech impediments, etc." *Id.* at 443. Nevertheless, the Foundation has so far directed its efforts exclusively toward sightless former servicemembers. *Id.* at 444. BAVF has held Flag Day celebrations; it has presented awards to journalists and members of Congress for demonstrating an interest in handicapped veterans' issues; and it commissioned a recorded reading of the Constitution, which it mailed postage free to 17,-

500 blinded veterans nationwide. *Id.* In addition to these principal activities, BAVF found employment for three blinded veterans, and donated some "trial lenses" to the Veterans Administration. *Id.* BAVF plans to develop an inexpensive "folding cane" and to set up an outreach program for veterans blind in one eye and suffering from diabetes. *Id.* BAVF also "aspires someday to build a rehabilitation center." *Id.*

According to BAVF's president, it never occurred to the three BAVF founders that the name "Blinded American Veterans Foundation" resembles the name of the founders' former employer, "Blinded Veterans Association." *See* Joint Appendix (J.A.) at 389.[2] There can be no doubt, however, that the names are similar. BAVF's original logo—"BAV" in large type, followed by "foundation" in small type below—also bore a marked resemblance to the Association's "BVA." *See* 680 F.Supp. at 445 n. 1 (noting, *inter alia*, that BAVF has "since abandoned" "BAV" in large type as its logo).

In 1986, BAVF applied to 552 local campaign organizations involved in the Combined Federal Campaign (CFC). Those organizations listed BAVF, alphabetically ahead of BVA, as a prospective recipient of CFC funds. *Id.* at 444. Despite its lack of significant accomplishments at that point, BAVF did rather well in its initial fundraising foray: the Foundation's 1986 income totalled between $35,000 and $40,000, half from CFC pledges and half from corporate contributions. *Id.*

On June 5, 1986, BVA filed an action in the district court under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982),[3]

---

1. John Fales, President of BAVF, was a BVA employee from 1974 to 1982 and served as BVA's National Outreach Employment Director from 1976 to 1982. Don E. Garner, BAVF's Treasurer, worked at BVA for over three years, and was the National Field Service Director of BVA until 1976. Dennis R. Wyant, BAVF's Secretary, worked at BVA for over four years, serving as President of BVA in 1977. Brief for Appellee at 5. All three men are blinded veterans. *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 680 F.Supp. 442, 444 (D.D.C.1988).

2. The district court disbelieved this testimony. *See* 680 F.Supp. at 444–45 & n. 1.

3. That section provides:
 Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and

seeking to enjoin the Foundation "from using the words 'Blinded' and 'Veterans' in its name, and from using the initials 'BAV' to describe itself." Complaint for Injunction, *Blinded Veterans Ass'n v. Blinded Am. Veterans' [sic] Found.*, C.A. No. 86–1563 at 8 (D.D.C. June 5, 1986). The complaint sought no damages. BVA alleged that BAVF's "deliberate choice of a too-similar name ... constitutes unfair competition, false representation and description, false advertising, palming off, and deception of the public, and injures the good will of [BVA]." *Id.* at 1.

On March 8, 1988, the district court decided that BAVF had infringed BVA's trademark. The court therefore enjoined BAVF from using the name "Blinded American Veterans Foundation," the initials "BAV" or "BAVF," and any name in which "veterans" and "blind" or "blinded" appear as noun and modifying adjective. 680 F.Supp. at 446.

The district court ruled first that the term "blinded veterans" is not a "generic term ... incapable of acquiring trademark significance." Rather, the term is "at the least, a 'descriptive term' in trademark parlance, which is entitled to protection against infringement if it has, over time, acquired in the mind of the relevant public a 'secondary meaning.' " *Id.* at 445. The court next concluded that "Blinded Veterans Association" has acquired a secondary meaning. As evidence, the court relied on the effort and expense that have gone into BVA's continuous promotion of itself "as the preeminent private voluntary proponent of the interests of blinded former U.S. service personnel" and of its services for blinded veterans. *Id.* The court added that its conclusion concerning secondary meaning was "reinforced ... by both BAVF's startling success in its maiden fundraising venture with no history of significant accomplishment, and by the tenacity with which it seeks to preserve its right

to use the name it has chosen for itself." *Id.*

Finally, the district court found it likely that potential contributors would confuse BVA and BAVF. BVA's name is "easily misapprehended by intending benefactors even when no alleged imposter is on the scene," the court observed, citing mistaken variations of BVA's name on contributions and bequests clearly intended for the Association. *Id.* at 446 & n. 3. "When [BAVF's] name is offered as an alternative," the court reasoned, "the potential for confusion approaches totality." *Id.* at 446. The court also credited the results of a survey conducted by a University of Maryland professor of English and linguistics. That survey presented three lists of organizational names, one with only BVA's and BAVF's names and two with other names as well, to groups of between thirty and fifty-eight college students. The results of these tests "demonstrated that a substantial majority of the subjects either did not perceive a distinction between BVA and BAVF, or so garbled their names as to create a genuine doubt as to which they had in mind." *Id.* The court acknowledged that the tests were not a "market survey." *Id.* It doubted whether such a survey would be "practicable" in this case, however; and it concluded that, in any event, a market survey "would add little to the commonsense [sic] inference (which the test results confirm) that ordinary contributors believe one organization soliciting for sightless veterans is as good as another, because the ultimate beneficiaries are ostensibly the same." *Id.*

BAVF appealed, arguing that "blinded veterans" is a generic term incapable of acquiring trademark protection even if the term has acquired secondary meaning. Alternately, if secondary meaning is relevant, the Foundation faults the district court for not requiring survey evidence and for focusing on the duration of BVA's use of its

---

any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a) (1982).

name and logo and the efforts and expense that have gone into the Association's self-promotion rather than on the *effects* of those factors on the public's perceptions.

BVA offers three separate grounds for affirming the district court's decision: trademark infringement, violation of BVA's congressional charter, and "passing off." We hold that the term "blinded veterans" is generic and therefore not entitled to trademark protection. We further conclude that BVA's charter does not prohibit other organizations' use of that term in their names or their use of the initials "BAV" or "BAVF." BVA's passing off claim, however, remains viable. We therefore vacate the district court's judgment and remand for that court's determination whether BAVF is passing itself off as BVA.

## II.

### A. *Trademark Infringement*

The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness. Courts have identified four general categories of terms: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. These groupings are not airtight, however. As the Fifth Circuit cautioned:

> These categories, like the tones in a spectrum, tend to blur at the edges and merge together. The labels are more advisory than definitional, more like guidelines than pigeonholes. Not sur-

prisingly, they are somewhat difficult to articulate and to apply.

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir.1983). The rough contours of the categories, however, can be drawn from the array of trademark controversies in which courts have endeavored to characterize or classify terms.

The first category consists of "generic" terms.[4] A generic term is one commonly used to denote a product or other item or entity, one that indicates the thing itself, rather than any particular feature or exemplification of it. *See Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir.1986); *accord Abercrombie & Fitch v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976).[5] A generic term does not merely identify a particular characteristic or quality of some thing; it "connotes the 'basic nature'" of that thing. *Zatarains*, 698 F.2d at 790 (citation omitted). Because a generic term denotes the thing itself, it cannot be appropriated by one party from the public domain; it therefore is not afforded trademark protection even if it becomes associated with only one source. *See, e.g., National Conf. of Bar Examiners v. Multistate Legal Studies*, 692 F.2d 478, 487 (7th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *Abercrombie & Fitch*, 537 F.2d at 9.[6]

Descriptive terms, which compose the second category, directly describe a partic-

---

4. Generic terms are also called "common descriptive" terms, as distinguished from "merely descriptive" terms. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193–94, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985); *National Conf. of Bar Examiners v. Multistate Legal Studies*, 692 F.2d 478, 487 (7th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *compare* 15 U.S.C. § 1052(e), (f) (a "merely descriptive" term may be registered if it has "become distinctive of the applicant's goods in commerce") *with id.* § 1064(c) (registration may be cancelled if mark has become "the common descriptive name of an article"). For the sake of clarity, we will use "descriptive" to refer only to those terms capable of acquiring trademark protection upon proof of secondary meaning. *See infra* 1039–40.

5. *See, e.g., National Conf. of Bar Examiners*, 692 F.2d at 488 ("Multistate Bar Examination" denotes bar examination given in several states); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir.1977) ("Light Beer" or "Lite Beer" denotes low-calorie beer), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *see generally* J. McCarthy, Trademarks and Unfair Competition § 12:3 at 533–37 (2d ed. 1984) [hereafter McCarthy] (providing examples of generic terms); Greenbaum, Ginsburg, & Weinberg, A Proposal for Evaluating Genericism After *Anti–Monopoly*, 73 Trademark Reporter 101 (1983).

6. Moreover, if a registered trademark becomes a generic denotation of a particular product or service, the mark's registration may be cancelled. *See* 15 U.S.C. § 1064(c).

ular quality, function, or characteristic of a product or service.[7] Because descriptive terms are thus not inherently distinctive, they acquire trademark protection only upon proof of secondary meaning—*i.e.*, upon proof that the public recognizes only one source of the product or service. *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938) (stating that a term has acquired secondary meaning when "the primary significance of the term in the minds of the consuming public is not the product but the producer"); *see generally* J. McCarthy, Trademarks and Unfair Competition § 15:2 at 661–65 (2d ed.1984) [hereafter McCarthy] (defining secondary meaning).

The third category consists of "suggestive" terms. These are terms that do not directly describe a product or service, but suggest some quality of the article.[8] As one court usefully stated:

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Stix Prods. Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y. 1968); *see also General Shoe Corp. v. Rosen*, 111 F.2d 95, 98 (4th Cir.) (suggestive terms "shed some light upon the characteristics of the good" only "through an effort of the imagination on the part of the observer"), *reh'g denied*, 112 F.2d 561 (1940) (per curiam). Because suggestive terms only indirectly convey an impression of the products or services, they are considered inherently distinctive; suggestive terms therefore are protectable without proof of secondary meaning. *See* McCarthy § 11:20 at 488.

"Arbitrary" and "fanciful" terms compose the fourth category. An arbitrary term is one which is commonly used in the language, but has no intrinsic connection to the product.[9] A fanciful term is one coined for the purpose of serving as a trademark.[10] Because arbitrary and fanciful terms are inherently distinctive, they are protectable without proof of secondary meaning. *See* McCarthy § 11:2 at 435.

▆ The threshold issue for this court is whether "blinded veterans" is generic, and therefore unprotectable as a trademark,[11] or descriptive, and thus protectable upon

---

**7.** *See, e.g., Application of Keebler Co.*, 479 F.2d 1405 (Ct. Cust. & Pat.App.1973) ("Rich 'N Chips" chocolate chip cookies); *Metromedia, Inc. v. American Broadcasting Cos.*, 210 U.S.P.Q. 21 (S.D.N.Y.1980) ("Rocktober" rock music broadcast in October); *see generally* McCarthy § 11:8 at 449–53 (providing examples of descriptive terms).

**8.** *See, e.g., American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103 (2d Cir.1978) ("Roach Motel" insect trap); *Q–Tips, Inc. v. Johnson & Johnson*, 206 F.2d 144 (3d Cir.) ("Q–Tips" cotton swabs), *cert. denied*, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953); *see generally* McCarthy § 11:23 at 499–502 (providing examples of suggestive terms).

**9.** *See, e.g., Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir.) ("Black & White" scotch whiskey), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963); *Mustang Motels, Inc. v. Patel*, 226 U.S.P.Q. 526 (C.D. Cal.1985) ("Mustang" motels); *see generally* McCarthy § 11:4 at 440–41 (providing examples of arbitrary terms).

**10.** *See, e.g., Polaroid Corp. v. Polarad, Inc.*, 319 F.2d 830 (7th Cir.1963) ("Polaroid" optical devices and photographic equipment); *Clorox*

*Chem. Co. v. Chlorit Mfg. Corp.*, 25 F.Supp. 702 (E.D.N.Y.1938) ("Clorox" bleach); *see generally* McCarthy § 11:3 at 438 (providing examples of fanciful terms).

**11.** The name of a business enterprise, in contrast to the name of a product or service, is often referred to as a "trade name" rather than a "trademark." We use "trademark" here for two reasons. First, the protection accorded names of business enterprises and names of products and services are governed by the same basic principles. *See* McCarthy § 9:1 at 300–05. Second, "trade name" was sometimes used to refer generally to "nontechnical trademarks"—*i.e.*, terms which could not, under the common law, be appropriated to the use of one party or, under the Lanham Act, be registered as a trademark. *See* R. Callman, Unfair Competition, Trademarks & Monopolies § 17.05 at 21–22 (4th ed. 1983) [hereafter Callman]. Consistent with contemporary understanding and usage, we denote as a "trademark" the name of a product, service, or business enterprise that may be appropriated to the use of one party under the common law or the Lanham Act.

proof of secondary meaning.[12] The district court's rationale for finding the term descriptive is not apparent. The court stated first that "blinded" and "veterans" might be generic when used separately, as in "the blinded persons association" or "the veterans association," but then immediately concluded that together the words are descriptive. *Blinded Veterans Ass'n,* 680 F.Supp. at 445. In accord with the district court, we accept the general proposition that "[w]ords which could not individually become a trademark may become one when taken together." *Union Carbide Corp. v. Ever–Ready Inc.,* 531 F.2d 366, 379 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *see also* McCarthy § 11:10 at 458 ("The validity of a mark must be determined by looking at the mark as a whole. A composite mark should not be fragmented into its various pieces."). *But see National Conf. of Bar Examiners,* 692 F.2d at 488 (stating that "if the components of a trade name are common descriptive terms, a combination of such terms retains that quality"). Nevertheless, we are convinced, for the reasons next set out, that the combination of "blinded" and "veterans" in this case remains generic.

Because "blinded veterans" is not a registered trademark, the burden was on BVA to prove that the term is not generic. *See id.; Reese Publishing Co. v. Hampton Int'l Communications, Inc.,* 620 F.2d 7, 11 (2d Cir.1980); McCarthy § 12:2 at 528. BVA failed to shoulder that load. Indeed, BVA's own witnesses and exhibits effectively demonstrated the genericness of "blinded veterans," for they employed the term repeatedly to denote formerly sighted former warriors. *E.g.,* J.A. at 75–76, 189–90, 337–38; *see Reese Publishing,* 620 F.2d at 11–12 (such usage is probative of genericness); McCarthy § 12:2 at 529 & n. 12 (same). The district court itself, we note,

used the term generically. *E.g.,* 680 F.Supp. at 444 (observing the BAVF's founders "are themselves blinded veterans" and reporting that BAVF mailed recorded readings of the Constitution to "17,-500 blinded veterans").

A term need not be the sole designation of an article in order to be generic, *see* McCarthy § 12:2 at 525–26; the test for genericness is whether the public perceives the term primarily as the designation of the article, *see id.* § 12:2 at 522–23. "Blinded veterans" appears to fit that test. It is difficult to imagine another term of reasonable conciseness and clarity by which the public refers to former members of the armed forces who have lost their vision.[13] Courts have found generic other terms that seem less distinctly apt denotations of their respective articles. *See, e.g., National Conf. of Bar Examiners,* 692 F.2d at 488 ("Multistate Bar Examination" as denoting "test prepared for determining the competency of applicants to the bars of several states"); *Abercrombie & Fitch,* 537 F.2d at 11–12 ("Safari" as denoting particular types of khaki-colored apparel); *Dresser Indus., Inc. v. Heraeus Engelhard Vacuum, Inc.,* 395 F.2d 457, 462–63 (3d Cir.) ("Roots" as denoting rotary positive displacement lobe-type vacuum pumps), *cert. denied,* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed. 2d 270 (1968).

Just as "blinded" would be generic when used with "the blinded persons association," or "veterans" with "the veterans association," 680 F.Supp. at 445, so "blinded veterans" is generic when used to refer to once-sighted persons who served in the armed forces. Separately or together, the terms denote particular types of individuals; "blinded veterans" simply designates the twice-circumscribed category of people who are both blinded and veterans. We conclude, then, that the district court

---

12. We need not deal separately with the question whether the initials "BVA" are generic; if the full name is generic, an abbreviation is treated similarly. *See National Conf. of Bar Examiners,* 692 F.2d at 488; *F.S. Serv., Inc. v. Custom Farm Serv., Inc.,* 471 F.2d 671, 674 (7th Cir.1972).

13. The district court took pains to refer to blinded veterans by other terms, *e.g.,* "sightless former servicepeople" and "blinded former U.S. service personnel." 680 F.Supp. at 444, 445. We, too, have endeavored to employ other terms in this opinion. *See supra* p. 1041, *infra* p. 1041. The awkwardness of the alternate terminology reinforces our conclusion that the public uses "blinded veterans" generically.

lacked justification for declaring "blinded veterans" descriptive rather than generic.[14] We therefore do not address under a trademark rubric whether BVA proved that the term has acquired secondary meaning. *But cf. infra* 1046 & nn. 22, 24.

### B. *BVA's Congressional Charter*

■ BVA argues that, regardless of whether "blinded veterans" is protectable as a trademark, this court can affirm the district court's injunction on the basis of BVA's congressional charter. That charter provides:

> [BVA] and its duly authorized regional groups and other local subdivisions shall have the sole and exclusive right to have and use in carrying out its purposes the name Blinded Veterans Association and such seals, emblems, and badges as the corporation may lawfully adopt.

36 U.S.C. § 867 (1982). The Association asserts that this charter grants BVA not only the exclusive use "of the precise name 'Blinded Veterans Association' (and the letters 'BVA'), but also the right to prevent anyone else from using a confusingly similar name or logo." Brief for Appellee at 14. For support, BVA relies on *San Francisco Arts and Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (*SFAA*). That case involved a congressional charter granting the United States Olympic Committee (USOC) the exclusive use of the word "Olympic." *See* 36 U.S.C.

§ 380(c) (1982). Based on the congressional act, the Supreme Court upheld an injunction preventing San Francisco Arts and Athletics from using the word "Olympic" in conjunction with the "Gay Olympic Games."

A comparison of BVA's and USOC's charters readily reveals a crucial distinction between *SFAA* and this case. USOC's charter grants it the exclusive use not only of its name per se, but also of the word "Olympic." *See id.*[15] BVA's charter, however, gives the Association exclusive use only of the name "Blinded Veterans Association" and the specific symbols BVA adopts. *See* 36 U.S.C. § 867. BVA's charter does not extend to the words "blinded veterans" any more than it does to the individual words "blinded," "veterans," or "association." Given the clarity of the confined statutory language, unclouded by the sparse legislative history, *see, e.g.*, H.Rep. No. 2323, 85th Cong., 2d Sess. 1–2 (1958), we find no basis for believing that Congress intended the scope of the charter to extend beyond its literal terms.[16] We therefore hold that BAVF has not violated BVA's charter.

### C. *Passing Off*[17]

Even if "blinded veterans" is generic, BVA asserts, BAVF may be enjoined from passing itself off as BVA. Case law in this area is not perspicuous; there is, however, support for BVA's contention. For the reasons stated herein, we conclude that BVA

---

**14.** The only relevant case cited by the district court on this question, *American Diabetes Association v. National Diabetes Association*, 533 F.Supp. 16 (E.D.Pa.1981), *aff'd mem.*, 681 F.2d 804 (3d Cir.1982), does not persuade us otherwise. In that case, a district court held that "American" in "American Diabetes Association" is geographically descriptive, that the whole term had acquired secondary meaning, and that there was a likelihood of confusion between that organization and the defendant, the National Diabetes Association. *Id.* at 19–20. The court ruled on a motion for a preliminary injunction; the matter, therefore, was decided only tentatively, not definitively. *Id.* at 19. Moreover, the court did not offer much analysis, making it difficult to decipher, and therefore extrapolate, the court's reasoning.

**15.** USOC's charter also grants it the exclusive use of the word "Olympiad," the motto "Citius Altius Fortius," the familiar symbol of the International Olympic Committee—five interlocking rings—and the less familiar symbol of USOC— an escutcheon with a blue chief, red and white vertical bars on the base, and the five interlocking rings on the chief. *See* 36 U.S.C. § 380(c).

**16.** Interpreting BVA's charter as granting BVA the exclusive use of the term "blinded veterans" would require us to decide the constitutional question whether Congress may grant a private entity exclusive use of a generic term. The Supreme Court sidestepped this question in *SFAA*, apparently because it considered "Olympic" not generic. *See* 107 S.Ct. at 2979.

**17.** "Passing off" is also referred to as "palming off."

may, dependent upon further proceedings in the district court, succeed in obtaining limited relief to prevent BAVF from passing off.

■ If the name of one manufacturer's product is generic, a competitor's use of that name, without more, does not give rise to an unfair competition claim under section 43(a) of the Lanham Act. *See Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 939 (7th Cir.1986). Nevertheless, such a claim "might be supportable if consumer confusion or a likelihood of consumer confusion arose from the failure of the defendant to adequately identify itself as the source of the product." *Id.* (citing *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 997 (7th Cir.1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980)); *see also Technical Publishing Co. v. Lebhar–Friedman, Inc.*, 729 F.2d 1136, 1142 (7th Cir.1984); *London v. Carson Pirie Scott & Co.*, 4 U.S.P.Q.2d 1148, 1151 n. 1, 1987 WL 11382 (N.D.Ill. 1987).[18] Analogously, if an organization's own name is generic, a competitor's subsequent use of that name may give rise to an unfair competition claim if the competitor's failure adequately to identify itself as distinct from the first organization causes confusion or a likelihood of confusion. *See Liquid Controls*, 802 F.2d at 939–40 (suggesting that "Liquid Controls Corp." could have valid claim against "Liquid Control Corp." if there were more evidence of confusion than merely misdirected mail).

In either situation, the subsequent competitor cannot be prevented from using the generic term to denote itself or its product, but it may be enjoined from passing itself or its product off as the first organization or its product. Thus, a court may require the competitor to take whatever steps are necessary to distinguish itself or its product from the first organization or its product. In the paradigm case, *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938), for example, the Supreme Court held that the term "shredded wheat" is generic; the National Biscuit Company therefore was not entitled to exclusive use of the term. *Id.* at 116, 59 S.Ct. at 112. Because National Biscuit had been the only manufacturer of shredded wheat for many years, however, the public had come to associate the product and the term "shredded wheat" with that company. The Court therefore stated that the Kellogg Company, which also produced a shredded wheat cereal, could be required to "use reasonable care to inform the public of the source of its product." *Id.* at 119, 59 S.Ct. at 113–14;[19] *see also, e.g., Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 204, 16 S.Ct. 1002, 1015, 41 L.Ed. 118 (1896) (holding that "Singer" had become generic denotation of type of sewing machine, but requiring that defendant not use the word on its product or in advertisements "without clearly and unmistakably stating ... that the machines are made by the defendant, as distinguished from the sewing machines made by the Singer Manufacturing Company"); *Metric & Multistandard Components Corp. v. Metric's, Inc.*, 635 F.2d 710, 714 (8th Cir.1980) (finding "metric" generic designation of metric industrial supplies, but nevertheless concluding that

---

**18.** In *Miller Brewing Co. v. Falstaff Brewing Co.*, 655 F.2d 5, 7 (1st Cir.1981), the First Circuit stated broadly that "[u]nder no circumstances is a generic term susceptible of *de jure* protection under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) or under the law of unfair competition." A fuller reading of the case, however, indicates that the court was endeavoring only to state the now-familiar proposition that a generic term cannot acquire trademark protection—*i.e.*, that a generic term may not be appropriated from the public domain for the exclusive use of one party. *See id.* at 8; *cf. Technical Publishing Co. v. Lebhar–Friedman, Inc.*, 729 F.2d 1136, 1142 (7th Cir.1984) (suggesting that *Falstaff*'s holding may be limited to trademark protection). The court made no mention of passing off. We therefore do not read *Falstaff* as contrary to our decision.

**19.** The Court further said that "[f]airness requires that [Kellogg exercise its right to use the name 'Shredded Wheat'] in a manner which reasonably distinguishes its product from that of [National Biscuit]." 305 U.S. at 120, 59 S.Ct. at 114. The Court then determined that Kellogg had sufficiently distinguished its product by selling it in cartons different from National Biscuit's in size, form, and color, with a different label, a different number of biscuits in each carton, and the name "Kellogg" displayed prominently. *Id.* at 120–21, 59 S.Ct. at 114.

section 43(a) of Lanham Act had been violated because mark had become so associated with plaintiff that defendant's use of it created likelihood of confusion); *King–Seeley Thermos Co. v. Aladdin Indus., Inc.,* 321 F.2d 577, 581 (2d Cir.1963) (finding "thermos" generic denotation of vacuum-insulated container, but affirming requirement that defendant distinguish its product from plaintiff's by preceding "thermos" with "Aladdin's," by using only the lower case "t", and by never using the words "original" or "genuine" in describing its product); *DuPont Cellophane Co. v. Waxed Prods. Co.,* 85 F.2d 75, 80, 82 (2d Cir.) (finding "cellophane" generic denotation of cellulose transparent wrappings, but requiring defendant to identify itself as source of product in certain instances to avoid confusion with plaintiff's product), *cert. denied,* 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936) and 304 U.S. 575, 58 S.Ct. 1047, 82 L.Ed. 1539 (1938);[20] *O. & W. Thum Co. v. Dickinson,* 245 F. 609, 627–28 (6th Cir.1917) (requiring defendant to qualify and explain its use of the term "sticky fly paper" to differentiate its product from plaintiff's product of the same name); *G. & C. Merriam Co. v. Saalfield,* 198 F. 369, 373–76 (6th Cir.1912) (requiring defendant to accompany generic term "Webster's Dictionary" with sufficient explanation to avoid giving false impression that his book was plaintiff's); *Reddaway v. Banham,* 1896 App.Cas. 199, 221–22 (recognizing defendants' right to use generic term "camel hair belting" but requiring them to "clearly distinguish[ ] such belting from the belting of the plaintiffs"); *cf. Miller Brewing Co. v. Jos. Schlitz Brewing Co.,* 605 F.2d 990, 997 (7th Cir.1979) (rejecting claim of passing off because defendant had adequately identified itself as source of product by preceding generic name of product, "Light Beer," with producer's name, "Schlitz," and had not engaged in potentially confusion-generating practices such as using a similar label or misleading advertisements), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980).[21]

---

**20.** In *Kellogg* and *Singer,* the plaintiffs' patents on the products had expired. Upon expiration of the patents, the Supreme Court held in both cases, the right to make the products passed to the public. *Kellogg,* 305 U.S. at 117–18, 59 S.Ct. at 113; *Singer,* 163 U.S. at 185–86, 16 S.Ct. at 1008–09. In *King–Seeley Thermos* and *DuPont Cellophane,* the courts held that formerly exclusive trademark rights had been lost because the terms "thermos" and "cellophane," respectively, had become generic. *King–Seeley Thermos,* 321 F.2d at 579; *DuPont Cellophane,* 85 F.2d at 80–81. A court's authority to require competitors to distinguish themselves or their products is not limited, however, to instances in which the plaintiff once enjoyed an exclusive legal right to make a product or to use a particular name. *But cf. Liquid Controls,* 802 F.2d at 940 (distinguishing *King–Seeley Thermos* and *DuPont Cellophane* on this ground). Regardless of *how* a generic term becomes associated with a particular source, once it does, late-coming competitors may be required to distinguish themselves or their products sufficiently to prevent confusion. *See Brown Chem. Co. v. Meyer,* 139 U.S. 540, 547, 11 S.Ct. 625, 628, 35 L.Ed. 247 (1890) (holding, in case not involving expired patent or lost trademark, that defendant had right to use generic words "Iron Bitters" *"unless he uses them in such connection with other words or devices as to operate as a deception upon the public")* (emphasis added); *cf. Trinidad Asphalt Mfg. Co. v. Standard Paint Co.,* 163 F. 977, 982 (8th Cir.1908) ("It is immaterial that names like 'Singer' ... became public property by acquiescence of those who first employed them, instead of being naturally so by reason of structure and original meaning.... The important thing is that they are public property, not how they become so. If they are, it follows from that quality alone that all may truthfully apply them to their products, and that no one can lawfully monopolize them.... [U]nfair competition cannot arise from the mere use of words belonging to the public, *accompanied by a fair and truthful statement of the ownership and source of manufacture."*) (emphasis added), *aff'd,* 220 U.S. 446, 461, 31 S.Ct. 456, 460, 55 L.Ed. 536 (1911).

**21.** One commentator explains the results in some of these cases as predicated on the terms' "dual usage": one portion of the relevant market recognized a term as the mark of a particular source, whereas another portion used the term generically. *See* McCarthy § 12:16 at 565–68. Although this explanation accurately accounts, in part, for some of the judgments, *see, e.g., DuPont Cellophane,* 85 F.2d at 82 (requiring that defendant attach disclaimer only when dealing with consumers who associate "cellophane" with DuPont), it is underinclusive. In neither *Kellogg* nor *Singer,* for example, did the Supreme Court base its holding on a division in the public's understanding of the terms. Rather, the term in each case had a "dual usage" in another sense: the public in general used each term generically, but it also associated each term with a particular company because that

Under the approach set forth in these cases, a court will not act to remedy or prevent "confusion generated by a mere similarity of names." *Liquid Controls,* 802 F.2d at 940; *see also Standard Paint Co. v. Trinidad Asphalt Mfg. Co.,* 220 U.S. 446, 461, 31 S.Ct. 456, 460, 55 L.Ed. 536 (1911) (rejecting passing off claim because any confusion resulted solely from likeness of generic terms "rubbero" and "ruberoid" and not from any acts of defendant that might cause confusion). If a consumer confuses two manufacturers' shredded wheat cereal, for example, because both products share the same name and the consumer has a general appetite for crunchy, pillow-shaped wheat biscuits, there is no cause for judicial action. Such confusion results merely from the manufacturers' concurrent use of a generic term to designate their products, and the late entrant into the shredded wheat field cannot be said to have engaged in unfair competition. If, however, the consumer associates "shredded wheat" with a particular manufacturer, perhaps because that manufacturer enjoyed a de facto (or de jure) monopoly for many years, there is a risk that the consumer may erroneously assume that any product entitled "shredded wheat" comes from that manufacturer.[22] A second manufacturer may increase the risk of confusion by, for example, using a similar label, similar packaging, misleading advertisements, or simply by failing to state the product's source. Only when there is a likelihood that the newcomer might thus pass its product off as the original manufacturer's may a court require the newcomer to distinguish its product or to notify consumers explicitly that its product does not come from the original manufacturer.

In speaking of "passing off," we do not mean to insinuate that the complaining party must prove intent on the part of the passer off. Because passing off developed as an offshoot of the common law of fraud and deceit, some courts in the past required proof that the defendant intended to deceive consumers. *See, e.g., O. & W. Thum Co.,* 245 F. at 621 ("The essence of unfair competition consists in palming off, either directly or indirectly, one person's goods as the goods of another, and this, of course, involves an intent to deceive."); *see generally* McCarthy § 25:1 at 232–33; R. Callman, Unfair Competition, Trademarks & Monopolies § 21.40 at 159 (4th ed.1983) [hereafter Callman]; *cf. Liquid Controls,* 802 F.2d at 940 ("Passing off is a type of fraud. We have defined it as trying to get sales from a competitor by making consumers think that they are dealing with that competitor when actually they are buying from the passer off."). Today, however, the predominant view is that, "[w]hen used in connection with passing off, the term 'fraud' is understood to mean the result of the defendant's act, i.e., deception of the public, rather than his intent." Callman § 2.02 at 6; *see also id.* § 21.40 at 158–60; McCarthy § 25:1 at 234; *id.* § 23:30 at 139–40; *cf. FTC v. Algoma Lumber Co.,* 291 U.S. 67, 81, 54 S.Ct. 315, 321, 78 L.Ed. 655 (1934) ("Indeed there is a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the product of misrepresentation, however innocently made.").[23] Intent to deceive, nevertheless, retains potency; when present, it is probative evidence of a likelihood of confusion. *See, e.g., B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1264 (5th

company had been the only manufacturer for a long period. *See, e.g., Kellogg,* 305 U.S. at 118, 59 S.Ct. at 113; *Singer,* 163 U.S. at 186–87, 16 S.Ct. at 1008–09.

**22.** Commentators sometimes refer to this association between a generic term and one particular source, arising normally from that source's monopoly for an extended period, as "de facto secondary meaning." *See, e.g.,* McCarthy § 12:15 at 562–65. A generic term that acquires de facto secondary meaning is still not afforded trademark protection. *See id.* Nevertheless, as

the cases cited above establish, a generic term with de facto secondary meaning may be protected against passing off, *e.g.,* by requiring fair notice that a newcomer's product or service does not come from the original source.

**23.** Some courts, uneasy with abandoning the intent touchstone altogether, adopted the notion of "constructive fraud," *i.e.,* presuming intent from the results of the defendants' actions. *See* Callman § 21.40 at 160.

Cir.1971); CALLMAN § 20.49 at 385; McCAR-THY § 23:30 at 140.

Although the district court did not credit the testimony advanced by BAVF concerning the Foundation's conception, that court reported no conclusion, drawn from the evidence, that BAVF passed itself off as BVA. The court stated only that it disbelieved BAVF's president's testimony that it "never occurred" to him that BAVF's name was similar to BVA's and that BAVF did not plan to compete with BVA:

> The Court ... finds that BAVF was deliberately named, and presently refuses to change its name, to enable it to capitalize upon the association in the mind of the charitable public between the words "blinded" and "veterans" (and the understandable sympathy they engender), and, thus, to compete with [BVA] for the funds of those inclined to give to such a cause.

680 F.Supp. at 444–45. The Lanham Act, of course, does not proscribe competition per se. Nor is the competition described by the district court unfair merely because BAVF intended to capitalize upon the public's sympathetic association of the words "blinded" and "veterans." Only if BAVF was capitalizing on the public's association of "blinded" and "veterans" with BVA, and therefore reaping the benefits of BVA's goodwill, would the Foundation's actions constitute unfair competition.

True, the district court's opinion is somewhat ambiguous on this score. In a footnote, for example, the district court adverted to the evident similarity of BAVF's original logo—" 'BAV' in large type, followed by the word 'foundation' in small-type subscript"—to BVA's logo. *Id.* at 445 n. 1. The court also noted that, while the Foundation "professes to be concerned with veterans' 'sensory disabilities' generally, its founders selected a name which adverts only to blindness." *Id.* Although these findings, along with the fact that BAVF's founders all had worked for BVA, *suggest*

that BAVF's founders purposely sought to create confusion, the court did not expressly find so.

Moreover, even if BAVF's founders had intended to pass BAVF off as BVA, such an intent, although probative, would not conclusively establish unfair competition. *Cf. Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1184 (7th Cir.1989) (holding that district court erred in presuming consumer confusion on basis of defendant's intent to copy plaintiff's trade dress because intent "is but one of the factors 'bearing on the likelihood of confusion issue' ") (citation omitted). Ultimately, to succeed on its passing off claim, BVA must prove that the likely *effect* of BAVF's actions is to induce the public to think that BAVF is BVA. The evidence now in the record appears insufficient to establish this type of confusion. The district court noted that local CFC authorities had confused BAVF and BVA in processing their applications to be listed as beneficiary organizations in 1986, that BVA's name is often misstated by intending contributors even without the compounding presence of BAVF, and that college students in three experiments were unable to distinguish between the parties' names. 680 F.Supp. at 446 & n. 3. To prevail in this action, however, it is not enough for BVA to show confusion that is the natural consequence of the two organizations' use of generic names. *See Liquid Controls*, 802 F.2d at 940 (proof falls short if it does not show confusion results or is likely to result "from anything other than the similarity of names"). What is essential, we underscore, is evidence that people associate "blinded veterans" with BVA per se [24] and that, because of specific actions by BAVF that increase the risk of confusion, people are likely to think BAVF is BVA.

■ Taking into account the opacity of some of the decisional law in this area, and

---

**24.** Because we have ruled out the question of trademark protection, BVA is not called upon to show "secondary meaning" in that setting. BVA nevertheless must show, analogously, what has

been called "de facto secondary meaning"—*i.e.*, that people associate the generic term "blinded veterans" with BVA. *See supra* note 22.

the district court's understandable but incorrect assumption that trademark protection was available, we think it proper to permit the parties to submit additional evidence trained on the question whether people are likely to think that BAVF is actually BVA. *See Community for Creative Non–Violence v. Reid,* 846 F.2d 1485, 1496 n. 14 (D.C.Cir.1988) (because decision on appeal altered legal framework for the case, court permitted introduction of additional evidence and argument on remand), *aff'd,* ___ U.S. ___, 109 S.Ct. 2166, 104 L.Ed.2d 1 (1989). It would fill out and sharpen the record to prove (or disprove), for instance, that people who have contributed to BVA in the past have contributed, or are likely to contribute, to BAVF thinking it was BVA, or that people familiar with BVA's long service on behalf of blinded veterans are likely to think any group with a name containing "blinded veterans" or with the letters "B" "A" and "V" in its logo is the same as, or is associated with, BVA. BVA need not show actual confusion, we emphasize, but actual confusion is probative evidence that consumers are *likely* to confuse the two entities. *See* McCarthy § 23:2 at 51–54.

If the district court, on remand, finds from the evidence that BAVF is passing itself off as BVA, the court may order that BAVF distinguish itself from BVA to avoid confusion. This case obviously differs from *Kellogg* and other cases cited above because it involves the name of an organization rather than the name of a particular product. This difference precludes such a ready remedy as attaching the manufacturer's name to the generic name of the product. The district court could, however, require BAVF to attach a prominent disclaimer to its name alerting the public that it is not the same organization as, and is not associated with, the Blinded Veterans Association.[25] *See N. Hess' Sons, Inc. v. Hess Apparel, Inc.,* 223 U.S.P.Q. 1006, 1007–08, 738 F.2d 1412, 1413–14 (4th Cir.1984) (approving injunction allowing defendant apparel shop to sell shoes provided it state prominently in all of its advertising for one year, and display a sign in its show area indefinitely, alerting customers that it was not affiliated with plaintiff shoe store); *Warner Bros. Pictures v. Majestic Pictures Corp.,* 70 F.2d 310, 312–13 (2d Cir. 1934) (requiring defendant to accompany title of motion picture, which included generic term "Gold Diggers," with producer's name and disclaimer stating that the picture was not based on the play or plaintiff's motion picture entitled "The Gold Diggers"); *Barton v. Rex–Oil Co.,* 2 F.2d 402, 406–07 (3d Cir.1924) (allowing defendant to use term "Dye and Shine" in competition with plaintiff's "Dyanshine" provided defendant add affirmative, prominent disclaimer stating that his product was not that of plaintiff); *see generally* Callman § 20.35 at 294–96. Alternatively, the court could order that BAVF adopt another name containing the term "blinded veterans" that is less likely to confuse.[26] Either remedy would assist BVA to retain, and reap the benefits of, the goodwill it has built up

---

25. Disclaimers may sometimes have the counterproductive effect of generating the impression "that the defendant is anxious to avoid being confused with an inferior competitor and that he himself is the original bearer of the famous name." Callman § 20.35 at 296. To avoid such an impression in this case, the district court could require that the disclaimer state, for example, that BVA has been in existence since 1945, or was chartered by Congress in 1958.

26. BAVF apparently offered to change its name to any one of six variations, all of which contained the terms "Blind" or "Blinded" and "American" and "Veterans" and "Foundation." *See* Reply Brief for Appellant at 16. The Foundation, however, "refuse[d] to adopt another [name] which does not also include the words 'blinded' and 'veterans.'" 680 F.Supp. at 445 n. 1. Because "blinded veterans" is generic, BAVF cannot be forced to forego the use of those words. If, however, BAVF is currently willing to adopt a less confusingly similar name, albeit one containing those words, the need for further proceedings may be avoided. At oral argument, for example, BAVF's counsel stated that the Foundation is willing to change its name to one that would not have an "A" in its initials, such as "National Foundation of Blind[ed] Veterans"; dropping the "A" would at least lessen, by one letter, the similarity between the two organizations' acronyms.

over the years, while allowing BAVF to appeal, fairly, to the public's general desire to aid blinded veterans. *Cf. King–Seeley Thermos*, 321 F.2d at 581 (noting that requiring producer's name to accompany generic name of product would strike proper balance between defendant's interest in using generic term and plaintiff's and public's interest in avoiding confusion).[27]

### Conclusion

"Blinded veterans" is a generic term; BVA's name and logo therefore are not entitled to trademark protection. BVA's congressional charter also fails to provide a basis for relief; that charter protects BVA's own name and logo, but it does not prevent BAVF's use of a similar name and logo. BVA may be entitled to protection against passing off, however. If the district court determines that people will likely think that BAVF *is* BVA, it can fashion equitable relief in accordance with the considerations set forth in this opinion.

For the reasons stated, we vacate the judgment of the district court and remand for further proceedings.

*It is so ordered.*

---

27. BVA also urges this court, somewhat ambiguously, to consider the effect of the District of Columbia nonprofit corporation statute, which provides that the name of any corporation organized under the statute "[s]hall not be the same as, or deceptively similar to, the name of ... any corporation created pursuant to any special act of Congress to transact business or conduct affairs in the District." D.C.Code § 29–507(2) (1981). BVA made no claim, and the district court made no findings, under this provision.

---

In any event, the statute does not appear to create a private right of action for trademark infringement or unfair competition, but simply governs the mayor's approval of articles of incorporation. Thus, a person or corporation may appeal the mayor's disapproval to a court, *see id.* § 29–595, but the structure of the statute as a whole does not suggest that, under D.C. Code § 29–507, another corporation may sue a D.C. corporation with a deceptively similar name.