**DEBORAH HEART AND LUNG CENTER, Plaintiff,**

v.

**CHILDREN OF THE WORLD FOUNDATION, LTD., and The National Ethnic Coalition of Organizations Foundation, Inc., a/k/a NECO, and The Forum Club, Inc., Defendants.**

**No. CIV. A. 00–1313 (JBS).**

United States District Court, D. New Jersey.

May 24, 2000.

Kenneth Howard Mack, Alicia A. Zonetti, Fox, Rothschild, O'Brien & Frankel, L.L.P., Lawrenceville, NJ, for Plaintiff.

John Frank Burleigh, (Pro Hac Vice) Jacobs, deBrauwere & Dehn, New York City, for Defendants.

## OPINION

SIMANDLE, District Judge.

### I. INTRODUCTION

In this case, two worthwhile and beneficial charities which provide necessary hospital surgical services in the United States, free of charge, to foreign children, dispute whether defendants' use of Children of the World mark infringes upon plaintiff's longtime, unregistered use of that mark. Plaintiff Deborah Heart and Lung Center seeks a preliminary injunction barring defendants from using the Children of the World mark. The defendants are Children of the World Foundation, Ltd., the Forum Club ("Forum") and the National Ethnic Coalition of Organizations ("NECO"). For the reasons that follow, constituting this court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P., that relief will be granted.

### II. FACTS

#### A. Plaintiff

Plaintiff Deborah Heart and Lung Center ("Deborah") is a 161 bed specialty teaching hospital in Browns Mills, New Jersey, which provides diagnosis and treatment of heart, lung, and vascular diseases in adults and of congenital and acquired heart defects in children, from newborns to adolescents. Since the first heart surgery at Deborah in 1958, children have benefitted from Deborah's blend of highly specialized medical expertise and humanitarian concern. Deborah is consistently ranked among the top hospitals nationwide for quality of care and customer satisfaction, and it is a leader in cardiac surgery and nonsurgical diagnosis and treatment of heart disease, treating each year more than 250 American children with congenital heart defects.

In 1972, Deborah began outreach efforts to children of other countries where quality health care may not be available or generally possible. It began a CHILDREN OF THE WORLD outreach program towards this end. Since that time, over 2500 children with congenital heart defects and other severe medical problems from over 80 countries have come to Browns Mills, New Jersey as a result of the Children of the World program. The program covers all costs associated with a child's medical and surgical treatment and hospital stay, as well as lodging and meals on the Deborah medical campus, for one accompanying parent.

Some children come to the Children of the World program through the reference of foreign physicians. Others are directed

by relatives or friends familiar with the program. Others come through fraternal, ethnic, religious, or service organizations, such as local Rotary districts, the Gift of Life Program and the Dubon Family Fundacion Gogui, with all of whom Deborah has relationships.

The Children of the World program also seeks to ensure that children will have access to appropriate medical care at home, and it has made contributions towards that end, inviting physicians from around the world—Italy in 1972, Poland in 1981, Soviet Georgia in 1990, Lithuania in 1992, and, recently, Greece—to observe and learn techniques at Deborah.

Deborah's pediatric cardiac program includes pediatric cardiologists and pediatric surgeons, combining to give children a full spectrum of diagnostic and treatment options. Through the Children of the World program, between 80 and 100 children are treated annually at Deborah.

Deborah advertises its Children of the World nationally and internationally, through brochures and otherwise. Additionally, the program is promoted in numerous fundraisers each year. For the past thirteen years, Deborah has held an annual Children of the World Humanitarian Award Dinner Dance at hotels in the Meadowlands in East Rutherford, New Jersey. Other events have been held as well for the benefit of the Children of the World program. Over the years, Deborah has used interstate direct mail campaigns in benefit of the program, and in 1999 engaged in a United States-wide direct mail campaign.

The Children of the World program is funded by Deborah Hospital Foundation, a non-profit corporation and affiliate of Deborah. Individuals, corporations, private and corporate foundations, civic, religious, ethnic and service organizations, labor and industry groups have all, over the years, contributed to the sustenance and growth of Deborah's Children of the World program. The program is known nationally and internationally as a significant and high quality charitable program for providing medical care and treatment to children who would not otherwise receive such attention. Since 1972, the program has provided millions of dollars towards medical service, treatment, and educational training. As a result of the long use and extensive promotion of the mark Children of the World, Children of the World has come to identify charitable fundraising services and high quality medical care, treatment, and training emanating from a single source.

Although plaintiff does not currently have a registered mark in Children of the World, it does have an application pending. On February 5, 1999, Deborah filed U.S. application serial No. 75/637,978 to register the mark Children of the World in International Class 36 for charitable fundraising services and for medical services in International Class 42 with the United States Patent and Trademark Office.

### B. *Defendants*

Defendant, The Forum Club's Children of the World Foundation ("CWF"), is a not-for-profit tax exempt corporation formed about two years ago whose Board of Directors and Executive Committee are composed of members of the "Forum Club," an organization in the New York metropolitan region, which is a defendant by virtue of the Amended Complaint. When defendant selected the name Children of the World, plaintiff had already been offering these essentially identical pediatric medical and surgical services in its own Children of the World program for 25 years, benefitting more than 2000 children. The defendants' Children of the World Foundation was formed to provide medical and surgical treatment to children predominantly from developing countries free of charge. The idea for it was born in 1998 to a small group of Forum Club members. Its advertisements state that it helps needy children with defective hearts, neurological and urological disorders, and oth-

er congenital problems for whom treatment is not otherwise available in their home countries. It has brought at least seven children to the United States for surgery from the Dominican Republic, the Ukraine, and Russia, since its inception. It is promoted, advertised, and offered under the marks THE FORUM'S CHILDREN OF THE WORLD FOUNDATION, CHILDREN OF THE WORLD, AND CHILDREN OF THE WORLD FOUNDATION. Those marks and this program are not affiliated with Deborah's Children of the World program.

The Forum Club, NECO (National Ethnic Coalition of Organizations), and CWF are connected in many ways. They share offices in New York, share common officers and directors, and the Forum Club and NECO both actively solicit contributions for the CWF. (Mack Cert., Ex. A.) NECO was added as a defendant in the Amended Complaint.

At this stage, no evidence of actual confusion has been discovered, save the temporary initial confusion by the President of Deborah, Spero Margeotes, who, upon receipt of a flyer included in a package inviting him to NECO's Ellis Island Medal of Honor award dinner which occurred May 6, 2000, learned of Forum's Children of the World and thought that Children of the World had somehow affiliated with NECO and Forum Club.

C. *Filing of this Case*

Upon learning of defendant, Deborah immediately notified defendant by letter dated January 20, 2000 and demanded that defendant cease use of the Children of the World Foundation Mark. On January 27, 2000, defendant's attorney called Deborah's attorney to confirm that the letter had been received and asserted that use by defendant of the mark Children of the World Foundation was not an infringement. Subsequent to that, Deborah's counsel sent a second letter on February 3, 2000 further demanding that defendant cease use of its mark. On February 22,

2000, Deborah's counsel received a written response from defendant. According to defendant's view in its letter, there are at least six registered marks for Children of the World, as well as two other non-registered uses of Children of the World, including UNICEF's Children of the World Parade, which defendant sponsored and ran for UNICEF and the United Nations, and the Children of the World adoption agency in Syosset, New York. Defendant further pointed out that its use of the mark includes the word Foundation and is preceded by identification with the Forum Club or with NECO, and that plaintiff's usage of Children of the World appears to always be modified by reference to its source, Deborah Hospital. Based on that, defendant asserted that plaintiff's claim to exclusive use of the Children of the World mark is weak, particularly as it relates to children's services, and mitigates against a likelihood of confusion.

On March 16, 2000, plaintiff filed the instant lawsuit against defendant alleging false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); for trademark dilution under section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and N.J.S.A. 56:3–13.16 and 56:3–13.20; and for unfair competition under New Jersey common law. Plaintiff simultaneously asked for an order temporarily restraining defendant from any use of the Children of the World mark. Telephone oral argument was held on March 22, 2000, in which this Court found that plaintiff had established likelihood of success on the merits and likelihood of irreparable harm, but denied the TRO requested because what might have been a viable issue of personal jurisdiction and venue arose. Expedited discovery concerning the extent of defendants' contacts with New Jersey for purposes of personal jurisdictional venue revealed numerous systematic contacts related to fundraising activities of the defendants, and no defendant has filed a motion to dismiss for lack of personal jurisdiction nor for improper ven-

ue. The Court scheduled the preliminary injunction hearing held on May 10, 2000. Meanwhile, plaintiff filed an Amended Complaint naming NECO and Forum Club as defendants. Following the preliminary injunction hearing, at which all defendants appeared through counsel, this Court is prepared to issue this opinion.

## III. DISCUSSION OF LAW

### A. In Personam Jurisdiction over Defendant

■ The defendant Children of the World Foundation, Ltd., which is also known as the Forum Children of the World Foundation, has not moved to dismiss this case for lack of personal jurisdiction, and the time for doing so expired on May 2, 2000.[1] This court nonetheless must satisfy itself that such jurisdiction exists regarding the two related defendants— The Forum Club and the National Ethnic Coalition of Organizations. These defendants did not assert that this court lacked in personam jurisdiction over them at the time of the preliminary injunction hearing, but counsel also did not concede that such jurisdiction is present. Since injunctive relief is sought against each defendant entity, in an abundance of caution this court, aided by the expedited discovery that has occurred on this issue, will determine whether such jurisdiction exists before entertaining injunctive relief.

A federal court may exercise jurisdiction to the extent authorized by the forum state, Rule 4(e), Fed. R. Civ. P. Here, the New Jersey Long Arm statute extends to the limits of the Fourteenth Amendment, thus this Court may exercise jurisdiction if

constitutionally permissible. The test for determining whether such exercise is permissible is the well known minimum contacts standard. Under this standard, the first step is to determine whether the defendant has sufficient contacts with the forum state. The second step is to evaluate those contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice. See Burger King v. Rudzewicz, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

In this case, plaintiff has demonstrated that both prongs of the in personam jurisdiction test are satisfied.

### 1. Minimum Contacts

With respect to sufficient minimum contacts, this prong is easily met. First, the defendants have sent numerous direct mail donation solicitations to individuals living in New Jersey. NECO and CWF routinely solicit donations from New Jersey residents listed on the mailing list submitted to this court. (See List of New Jersey Donors Appended to Def's Ltr Dated Apr. 25, 2000.) Such solicitation efforts by NECO yield contributions from New Jersey residents and large New Jersey public institutions such as the Port Authority of NY/NJ, and the State of New Jersey itself. At least a portion of the proceeds of these solicitations are directed to funding the activities of the Children of the World Foundation. Moreover, evidence of direct mail solicitation to residents of the forum state provides evidence of intent to avail oneself of the benefits of doing business in the forum state. Cf. ABTS v. Greater Capital Corp., 861 F.2d 793 (3d Cir.1988)

---

1. Normally, a motion to dismiss for lack of personal jurisdiction may be brought post-answer so long as the objection to personal jurisdiction is noted in the Answer, unless the defendant files pre-Answer motions, in which case personal jurisdiction objections are waived if not included. See Fed.R.Civ.P. 12(g) & (h). In this case, however, in a telephone conference of April 6, 2000, this Court set a deadline for filing a motion to dismiss for lack of in personam jurisdiction of

April 19, 2000, and discovery was taken on the issue of personal jurisdiction. That deadline was later extended first to May 1, and then to May 2, in telephone conferences of April 17 and 26, respectively. The purpose of the deadline and special discovery, to which the parties agreed, was to resolve the personal jurisdiction issue before the preliminary injunction hearing. Defendants did not file the motion to dismiss, and the right to do so has been waived.

(purposeful availment through business practice). Second, NECO takes part in the Ellis Island Medal of Honor Gala. A substantial part of Ellis Island is New Jersey territory, *New Jersey v. New York*, 523 U.S. 767, 118 S.Ct. 1726, 140 L.Ed.2d 993 (1998), and funds therefore are personally solicited for defendants in New Jersey. Such contacts with New Jersey governmental entities shows further purposeful availment of the laws of this state.

### 2. *Fair Play and Substantial Justice*

As alleged by the complaint, there exists a substantial likelihood of confusion over the trade name "Children of the World" due to defendants' employment of that name in soliciting donations for its charities. As shown by the foregoing contacts analysis, there are potentially confusing donation solicitations being sent directly to potential donors in New Jersey, thus there exists a likelihood that the name will be confused *here*. This means that the wrong complained of—behavior likely to lead to trade name confusion—is occurring in the forum state, thus giving the forum state a strong interest in providing a forum for redress of this behavior.

This Court finds that personal jurisdiction exists over all three defendants, and it will proceed to adjudicate the motion for injunctive relief.

### B. *Standard of Review for Preliminary Injunctions*

A preliminary injunction is an extraordinary remedy which should be granted only if the movant produces evidence sufficient to demonstrate the following four factors:

(1) a likelihood of success on the merits;

(2) the extent to which the movant will be irreparably injured by the conduct complained of;

(3) the extent to which preliminary relief will result in even greater harm to the nonmoving party; and

(4) the extent to which granting the preliminary relief will be in the public interest.

*Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 879 (3d Cir.1997)(citing *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Board of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996)(en banc)). These same standards govern preliminary injunctive relief on trademark cases. *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 191–192 (3d Cir. 1990); *Fotomat Corp. v. Photo Drive–Thru, Inc.*, 425 F.Supp. 693, 711 (D.N.J. 1977). The Third Circuit has held that the moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm in the absence of injunctive relief in order to obtain a preliminary injunction, and that a preliminary injunction granted by a district court will not be sustained on appeal if either of these requirements is not satisfied. *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 197 (3d Cir.1990). District courts may award preliminary injunctive relief only after weighing all four factors. *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1438 (3d Cir.1994).

### C. *Probability of Success on the Merits*

#### 1. *False Designation of Origin Claim (15 U.S.C. § 1125(a)), Dilution, and Common Law Unfair Competition:*

To prove trademark infringement pursuant to 15 U.S.C. § 1114(a), a plaintiff must show that (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning their origin. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir.1994). The same standards apply to claims brought under 15 U.S.C. § 1125 for unfair competition, *id.* at 473, as well as to claims for infringement and unfair competition under New Jersey common law. *Barre–Nation-*

*al, Inc. v. Barr Lab, Inc.,* 773 F.Supp. 735, 746 (D.N.J.1991).

### a. *Plaintiff's Mark is Protectable*

■ The first two requirements, that the mark is legally valid and protectable and that plaintiff owns the mark, are automatically met where plaintiff's mark has been federally registered, in continuous use for five consecutive years, and is not subject to a proceeding challenging the mark's validity. *Fisons,* 30 F.3d at 472. Unregistered marks are not presumed valid, but an unregistered mark is still entitled to protection, "on the principle that unlicensed use of a designation of origin serving the function of a registered mark constitutes a false designation of origin and a false description or representation. A designation may only receive protection, however, if the public recognizes it as identifying the claimant's 'goods or services and distinguishing them from those of others.'" *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986).

■ As the Third Circuit explained in *Canfield,* the type of protection available for the mark depends on how the mark is identified: arbitrary, suggestive, descriptive, or generic. *Id.* If the mark is arbitrary or suggestive, the mark owned by the plaintiff is considered "distinctive, and it automatically qualifies for trademark protection at least in those geographic and product areas in which the senior user applies it to its goods." *Id.* at 297. If the mark is descriptive, the plaintiff could still be entitled to protection, but only if the mark has a secondary meaning to consumers. *Id.*

■ In the *Canfield* case, the Third Circuit was asked to determine if the mark "chocolate fudge" as applied to diet soda was suggestive, descriptive, or generic. Suggestive marks suggest, rather than describe, the characteristics of the goods. The Court found that "chocolate fudge" was not suggestive, despite the plaintiff's argument that the soda merely suggested a chocolate fudge taste. The Court then determined that "chocolate fudge" was generic, meaning that the mark functions as the common descriptive name of a product class, rather than descriptive, which would have meant that it simply described a characteristic or ingredient of the article to which it refers.

Defendants also cite to *Blinded Veterans Assoc. v. Blinded American Veterans Foundation,* 872 F.2d 1035 (D.C.Cir.1989) (Ginsburg, J.), as factually on point and supportive of its position that the term "Children of the World" is generic and thus not protected by trademark. In *Blinded Veterans,* a charitable organization promoting the interests of blinded veterans sued to enjoin a competitor's use of a similar name. Like the Third Circuit, the District of Columbia Circuit stated that a "generic" name simply names the thing itself, rather than any particular feature or exemplification of the thing. *Id.* at 1038. The court elaborated that words which could not individually become a trademark may become one when taken together. *Id.* at 1041. Applying these principles to the name "Blinded Veterans", the court found that, even once combined, the terms blinded and veterans remain generic because there was no other reasonable way to describe former members of the U.S. military who have lost their vision. *Id.* Separately or together, the court concluded, the terms connote particular types of individuals, and this basic connotation does not disappear simply because the terms are combined.

Here, plaintiff's use of Children of the World is not generic. Unlike the term "blinded veterans," there are other terms that can be used to describe the targeted group, such as "Humanity's Children," or "The World's Children," or "Healing the World's Youth," or "International Healing Heart." Such alternative terms convey the same basic message as the subject mark, and do so in a reasonably graceful way. Because the term "Children of the World" connotes a grouping of individuals that can be described in many other terms,

the Court finds that this case is distinguishable from *Blinded Veterans.*

■ Turning to the other categories described in *Canfield*, it is clear that Children of the World is not the name of a product class. It is also not arbitrary, for at the very least it suggests a main characteristic of the program, namely that children from around the world are offered care at Deborah. The question is whether the mark is suggestive or descriptive. This Court finds that either way, it does not matter in the instant case. The mark is most likely suggestive, for it suggests that the program helps Children of the World. It does not describe the fact that the program provides medical services for various children from foreign lands. Even if the name was considered descriptive, however, it has acquired a secondary meaning within the context of provision of heart health care services to international children. That UNICEF and an adoption agency also use the name makes no difference, as the mark has its secondary meaning in the relevant context, namely, providing free hospital care to needy children where such treatment is unavailable in their home nations, which happens to be in the same context in which defendant operates.

Plaintiff has continuously used this mark for almost thirty years, including in fundraising in the last 13 years, and its actual and continuous use of the mark entitles it to protection. *See Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 292 (3d Cir.1991).

The inquiry, then, focuses on the likelihood of confusion. The plaintiff has the burden, in a trademark case, to prove the likelihood of confusion and not the mere possibility of confusion. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 201–206 (3d Cir.1999) (en banc).

■ To establish likelihood of confusion, a plaintiff must prove that " 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " *Fisons,* 30 F.3d at 472 (quoting *Dranoff–Perlstein Assoc. v. Sklar,* 967 F.2d 852, 862 (3d Cir.1992)). Plaintiff's required showing of proof on the likelihood of confusion issue depends on whether the trademark owner and the alleged infringer deal in directly competing products.

b. *Directly Competing Services*

■ Plaintiff has demonstrated that the services that are the subject of its trademark claim are directly competing because both marks identify programs of free surgical care for foreign children, soliciting donations in the same overlapping regions and rendering care at facilities less than 100 miles apart. Where the parties do deal in directly competing products, "the court need rarely look beyond the mark itself." *A & H Sportswear, supra,* 166 F.3d at 202, quoting *Interpace Corp. v. Lapp., Inc.,* 721 F.2d 460, 462 (3d Cir. 1983). "In those cases the court will generally examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive, and compare it against the challenged mark." *Id.* The question is whether the marks are "confusingly similar." *Country Floors, Inc. v. Partnership of Gepner and Ford,* 930 F.2d 1056, 1063 (3d Cir.1991).

Here, plaintiff's and defendants' services do directly compete. These specialized services—charitable pediatric surgical care to foreign children—are essentially identical. The geographic areas of operation are largely overlapping, with defendants offering their services under the Children of the World name within 80 miles of Browns Mills, New Jersey. There is a substantial overlap in the donor solicitation list.

A comparison to *American Cyanamid Co. v. Nutraceutical Corp.,* 54 F.Supp.2d 379 (D.N.J.1999) may be helpful. In *American Cyanamid,* the makers of Cent-

rum multivitamins multiminerals sued the makers of a line of all-natural vitamin and dietary supplement products for color spectrum trademark infringement. *Id.* The defendant's products were "much more diverse than plaintiff's" but at least "coexist[ed] within an overarching market for vitamins and health food supplements." *Id.* at 382. Defendant's products were largely sold in health food and grocery stores while plaintiff's products were sold in the food trade, the drug trade, among mass merchandise, in warehouse clubs, by wholesalers, and miliary commissaries, *id.* at 382, 383, but both parties' products were available at some locations. *Id.* at 383. Judge Wolin found that despite the "defendant's assertion that its products are all-natural and contain greater amounts of source nutrients, it is clear that the products are intended to provide substantially similar benefits". *Id.* at 386. He noted that "from a consumer's standpoint, the parties' products are no doubt considered in large part functionally interchangeable." *Id.*

Similarly here, plaintiff's and defendants' services are in direct competition with one another. Both are set up to provide free hospital services to children internationally. Although they do not compete for patients in the sense that there are certainly too many sick children around the world for even the two programs to manage alone, they do compete for fundraising dollars, necessary to the operation of their programs and continuation of their services. Millions of dollars in services do not come cheaply or without supporters.

Having found that the parties' services do directly compete, and that the plaintiff's mark is entitled to protection as distinctive because it is either suggestive or descriptive with a secondary meaning, the court must next determine the degree of similarity between the parties' marks: are they so similar that they create a likelihood of confusion regarding the source, sponsorship, or affiliation of the parties' products.

*See American Cyanamid,* 54 F.Supp.2d at 387. "The marks need not be identical, only confusingly similar." *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co., Inc.,* 963 F.2d 628, 636 (3d Cir.1992), *overruled on other grounds* in *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Also, because the goods here are direct competitors, the degree of similarity need not be as strong as in dissimilar goods or services. *American Cyanamid,* 54 F.Supp.2d at 387.

■ The relevant question is whether an average consumer would likely confuse or associate the parties' services and marks with one another, *id.* (citing *Fisons,* 30 F.3d at 477–78), based on "the overall impression created by the mark as a whole . . . ." *Taj Mahal Enterprises, Ltd. v. Trump,* 745 F.Supp. 240, 247 (D.N.J. 1990).

Defendant here contends that the marks are not confusingly similar because defendant adds Foundation to the end of the mark and because both marks are preceded by source identification: The Forum or Deborah. This Court finds that despite these differences, these marks are confusingly similar. The marks are not always preceded by a source identifier (see Compl. Ex. C), and the overall impression of the marks is confusingly similar. The defendants often call their program simply the Children of the World program, as does plaintiff. Therefore, there is a likelihood of success on the merits of plaintiff's claims under the infringement standards for direct competition.

2. *Trademark Dilution under 15 U.S.C. § 1125(c) and N.J.S.A. 56:3–13.16 and 56:3–13.20*

Section 1125(c) of the Lanham Act provides that

The owner of a famous mark shall be entitled . . . to an injunction against another person's commercial use in commerce of a mark or trade name, if such

use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.

15 U.S.C. § 1125(c). The act defines dilution as

the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of–

(1) competition between the owner of the famous mark and other parties, or

(2) likelihood of confusion, mistake, or deception.

15 U.S.C. § 1127. The New Jersey anti-dilution statute provides for similar equitable and legal remedies. *See* N.J.S.A. 56:3–13.20.

▆▆▆▆ Dilution of a famous trademark takes two forms: "tarnishment," which is when a mark is linked to substandard goods or services such that the goodwill and positive associations to the mark are diminished, and "blurring," which is the gradual diminution of a mark's value through an unauthorized use of the mark. *See 4 McCarthy on Trademarks and Unfair Competition* §§ 24.69 and 24.68 (4th ed.1999). In *American Cyanamid,* Judge Wolin applied the test for finding trademark dilution articulated by the Fourth Circuit in *Ringling Bros.–Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Develop.,* 170 F.3d 449, 450 (4th Cir.1999):

(1) a sufficient similarity between the junior and senior marks to evoke an "instinctive mental association" of the two by a relevant universe of consumers which (2) is the effective cause of (3) an actual lessening of the senior mark's selling power, expressed as "its capacity to identify and distinguish goods or services."

*American Cyanamid,* 54 F.Supp.2d at 391 (quoting *Ringling Bros.,* 170 F.3d at 458.)

▆▆▆ In the instant case, it is probable that plaintiff will establish at trial that plaintiff's mark of Children of the World is famous within the fields of medicine and/or medical charities, based on the totality of eight factors listed in 15 U.S.C. § 1125(c)(1) (distinctiveness, duration of use, duration and extent of publicity/advertising, geographic context, channels of trade, degree of recognition in relevant channels of trade, nature and extent of use by same or similar marks by third parties, and whether registered). These characteristics have already been described above and are summarized as follows.

*Distinctiveness.* As discussed above, the parties' marks are essentially identical, and plaintiff's mark is probably suggestive, although not rising to the level of an arbitrary or fanciful mark.

*Duration of Use.* It is undisputed that plaintiff has used the mark "Children of the World" for nearly 30 years, while defendants' use of the mark began less than two years ago.

*Duration and extent of publicity/advertising.* Plaintiff's pediatric surgical services for 2500 children from 80 countries have been publicized over many years in connection with the Children of the World mark, for fundraising and publicity purposes. Defendants also have engaged in intensive fundraising and publicity for their Children of the World program over the past two years, and news articles about defendants' Children of the World activities have also appeared in this region's press.

*Geographic context.* Plaintiff and defendants render medical services under their respective Children of the World programs in Browns Mills, New Jersey and in New York, New York respectively. Both facilities are in the Greater New Jersey/New York metropolitan area. Plaintiff's annual program fundraisers have been held in the Meadowlands of northern New Jersey, about 10 miles from defendants' annual fundraising program on Ellis Island. Many of defendants' individual and corporate donors reside in New Jersey, as do many of defendants' annual award recipients. It is likely that persons in the New

Jersey and New York charitable communities and medical communities would hear of the existence of both programs through fundraising activities and general publicity.

*Channels of trade and degrees of recognition in channels of trade.* Both programs have fundraising intermediaries (Deborah Hospital Foundation and NECO) and the degree of donor solicitation overlap is not yet known. The degrees of recognition of the marks is not known with precision because they have not been measured.

*Nature and extent of use of same or similar marks by third parties.* As noted above, "Children of the World" is used by third parties in connection with a variety of services, none of which involve surgical care.

*Registration of mark.* Plaintiff's application is pending with the U.S. Patent and Trademark office (Serial No. 75/637,978, filed on February 5, 1999) to register the mark CHILDREN OF THE WORLD in International Class 36 (for charitable fundraising services) and in International Class 42 (for medical services).

This Court has thus found that the evidence is likely to establish that plaintiff's mark is famous and, as discussed above, that the marks are confusingly similar, certainly enough so as to evoke an "instinctive mental association" between the two. The remaining question is whether plaintiff will probably succeed in proving that the similarity is the effective cause of an actual lessening of plaintiff's "capacity to identify and distinguish goods or services." If permitted to continue, it is probable that defendants' use of the confusingly similar mark for essentially the same services (charitable and medical) will cause actual lessening of plaintiff's capacity to distinguish its own senior program from the defendants' emerging program. Plaintiff will increasingly be called upon to explain that its program is not related to the New York program, and that task will be increasingly burdensome as defendants expand their publicity and fundraising activities. Plaintiff has shown probable success in proving that the specter of two Children of the World programs existing side by side will be likely to dilute the plaintiff's good will as the only program of that name for 28 years and complicate plaintiff's attempts to distinguish its program from that of the newcomer.

Thus, this court finds plaintiff is also likely to succeed on its claims of trademark dilution under federal and state law.

### C. *Irreparable Harm to Plaintiff*

 Harm to plaintiff can be presumed due to the likelihood of confusion which comes when, as here, different parties use substantially identical marks to identify substantially identical services. *Opticians Ass'n v. Independent Opticians,* 920 F.2d 187 (3d Cir.1990). This is a classic case of the issuance of injunctive relief to prevent "loss of control of reputation, loss of trade and loss of goodwill," *One World Botanicals Ltd. v. Gulf Coast Nutritionals, Inc.,* 987 F.Supp. 317, 336 (D.N.J.1997), the very things which the Lanham Act was designed to prevent.

Since infringement of trademark deprives the owner of control over its goodwill, the injury to goodwill is by its nature irreparable, whether or not accompanied by loss of trade. *Opticians Ass'n, supra,* 920 F.2d at 196–97; *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1380 (D.N.J. 1981); *Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.,* 656 F.Supp. 449, 457 (D.N.J.1987). This is true even if the infringer matches the high quality of plaintiff's services. *Fotomat Corp. v. Photo Drive–Thru,* 425 F.Supp. 693, 711 (D.N.J. 1977) (Gerry, J.).

### D. *Harm to Defendants*

 The court next considers the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued, a factor which has sometimes been referred to as weighing whether the balance of equities tips in favor of

the moving party. *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d 1136, 1140 (3d Cir.1986).

Defendants claim that they will be harmed if this injunction issues because they will lose the goodwill they have built up through their advertising and operations for the past two years. This harm may be self-incurred. However, given that the organization's major (and almost sole) donor at this point is NECO, one of the parties in this case, who would certainly know what this renamed organization is, there is unlikely to be measurable harm in a change of name of Forum's Children of the World Foundation.

Moreover, in balancing the harms, the plaintiff has operated for 28 years and served 2,500 children, while the defendants have begun within the past two years and have served approximately 10 children to date. The defendants' fundraising relationships are such that the Forum's Children of the World Foundation could change its name and explain the new name to the Forum's donors without enduring harm. The new name can be selected with minimal inconvenience, replacing the two-year-old name which has hardly had time to make its own impression. The defendants argue that this will deprive them of their first choice of names, and that other names are just not as suitable. The answer, of course, is that the defendants never had the choice to use Children of the World as their charitable pediatric surgery program's name without the prospect of creating confusion and harm to the predecessor mark of the plaintiff for these services. Defendants' second choice of name, whatever it may be (so long as it is not again infringing) must suffice. There is no evidence that enjoining defendants' use of their infringing mark will cause harm to the defendants' program beyond inconvenience and incidental expenses. This is especially so if a suitable grace period is provided before defendants' ongoing programmatic activities must cease use of the name.

### E. *Public Interest*

Finally, this Court must consider whether the public interest would be harmed by the granting of preliminary injunctive relief. The Court finds that the granting of preliminary injunctive relief would support the public interest. We are dealing here with two charitable organizations that provide almost identical services, free health care, surgery, and attendant cost-coverage for the sickest and neediest of children from foreign lands, except that plaintiff operates on a much larger scale and has been in operation for over 15 times longer than defendant. The public has an interest in the free proliferation of services provided by these organizations, but the public also has a right to know to whom they are giving their money and who is administering these services. When donors choose to give money to support Children of the World, they should be assured they are giving it to the Deborah Heart & Lung Center; if they want to give money to the charitable organization run by the Forum Club and NECO, they should likewise be able to know that such organization is its own, and not affiliated with Deborah. The consumers of these services should likewise know which organization is treating them and which is not. This preliminary injunction will aid the public in supporting charitable services and knowing to whom their money is to be given, as well as knowing which organization is rendering this care.

The public is also served by granting injunctive relief in a fashion that assures defendants' actual charitable efforts will not be interrupted while a new name is selected. Plaintiff has agreed that an injunctive order which gives defendants a 60–day transition period beyond which defendants must cease using the Children of the World name is suitable recognition of the public's interest in receiving uninterrupted medical services through defendants' charitable acts.

## IV. *SUMMARY*

 This court has found, on the basis of the record pending before it, that plaintiff has met its burden of proving entitlement to preliminary injunctive relief against defendants' continued use of the mark CHILDREN OF THE WORLD, or variations thereof, in connection with defendants' charitable fundraising services and charitable medical services, to be effective within sixty (60) days of today's date so as not to interfere with defendants' ongoing charitable activities. The court has found that plaintiff is likely to succeed on the merits of its claims for both infringement of plaintiff's trademark and dilution of plaintiff's trademark, and that the plaintiff will suffer irreparable harm to its ability to distinguish its services by this mark and to prevent dilution to the goodwill associated with its mark. The balance of harm tips in plaintiff's favor, and the prospect of harm to defendant or to the public interest can be ameliorated by a short grace period of transition to defendants' new, non-infringing name.[2]

The accompanying Order for Preliminary Injunction is entered.

### ORDER FOR PRELIMINARY INJUNCTION

This matter came before the court on motion of plaintiff, Deborah Heart and Lung Center, for preliminary injunctive relief against defendants Children of the World Foundation, Ltd., and the National Ethnic Coalition of Organizations Foundation, Inc., a/k/a NECO, and the Forum Club, Inc., which preliminarily enjoins defendants from any further use of plaintiff's name and mark CHILDREN OF THE WORLD or any other name or mark confusingly similar to or a colorable imitation of plaintiff's name and mark CHILDREN OF THE WORLD; and

The court having considered all submissions of evidence and the briefs and arguments of counsel for the respective parties at a hearing on May 10, 2000; and

For reasons stated in the courts's Opinion of today's date, for good cause shown pursuant to Rule 65, Fed.R.Civ.P.;

IT IS this 24th day of May, 2000, hereby

ORDERED AND ADJUDGED that Plaintiff's motion be, and it hereby is, **GRANTED;** and

IT IS FURTHER ORDERED AND ADJUDGED that Defendants Children of the World Foundation, Ltd., the National Ethnic Coalition of Organizations Foundation, Inc., a/k/a NECO, and the Forum Club, Inc., and all persons who are Defendants' officers, agents, servants, employees, and attorneys and others in active concert or participation with them are hereby preliminarily ENJOINED and RESTRAINED from:

Using, in connection with defendants' charitable medical services and charitable fundraising services, the names and marks CHILDREN OF THE WORLD, CHILDREN OF THE WORLD FOUNDATION, CHILDREN OF THE WORLD PROGRAM, THE FORUM'S CHILDREN OF THE WORLD FOUNDATION, and any other colorable imitation of plaintiff's CHILDREN OF THE WORLD mark for charitable medical services and charitable fundraising services;

IT IS FURTHER ORDERED that Plaintiff shall post security in an amount to be determined at the hearing pursuant to Rule 65(c), Fed.R.Civ.P., scheduled for *Thursday, June 8, 2000 at 3:45 P.M. in Courtroom 4A;* and

IT IS FURTHER ORDERED that the injunctive provisions of this Order shall be subject to a transition period and shall

---

**2.** As discussed with the parties at the conclusion of the hearing, this court will require plaintiff to give security, as required by Rule 65(c), Fed.R.Civ.P., in an amount to be determined at a bond hearing, if the parties are otherwise unable to agree. This hearing is scheduled for June 8, 2000, and hence, any required security will be determined and in place well before expiration of the 60–day transition period on July 23, 2000.

therefore take effect upon the 60th day after today's date, namely, *July 23, 2000.*