**EXPERIENCE WORKS, INC., Plaintiff,**

v.

**Elaine CHAO, Defendant.**

**No. CIV.A. 03–1233(GK).**

United States District Court, District of Columbia.

June 17, 2003.

John S. Pachter, Smith, Pachter, McWhorter & Allen, P.L.C., Vienna, VA, for Experience Works, Inc, Plaintiff.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiff, Experience Works, Inc., is a not-for-profit organization which offers training, employment, and community service opportunities for older workers. It seeks, in this action, to enjoin the Department of Labor ("DOL" or "the Department") from completing its current grant-making cycle for the Community Service Employment Program ("the Program" or "SCSEP") authorized by the Older Americans Act, 42 U.S.C. § 3056, for Program Year 2003. Plaintiff's primary argument is that the DOL is violating the Older Americans Act by providing, for the first time, for a national competition of funds. According to Plaintiff's interpretation of the statute, incumbent grantees may not be subjected to national competition unless they have failed to meet national performance measures for the last two years.

Upon consideration of the Plaintiff's request for a Temporary Restraining Order and/or a Preliminary Injunction, the Department's Opposition, the numerous declarations and exhibits submitted, the lengthy oral argument and applicable law, the Court concludes that Plaintiff's request must be **denied.**

## I. BACKGROUND [1]

The Program was originally authorized by Title V of the Older Americans Act of 1965, 42 U.S.C. §§ 3056–3056n, to foster and promote useful part-time employment

---

**1.** The DOL's Program Year commences July 1, 2003. Given the parties' need for a timely disposition of the request for preliminary injunctive relief, the Court must, by necessity, make rather sparse findings.

opportunities and employment training in community service activities for older individuals. While these individuals (referred to as "participants") must be 55 years or older, many are in their 70s, 80s and even 90s. The majority of the participants live below the poverty line · and are women; many of them are minorities, many live in rural areas, and many suffer from physical and/or mental disabilities. Despite these disadvantages, the participants are able, through their part-time employment, to provide valuable community service to non-profit institutions in their local areas.[2] For many of the participants, the opportunity to contribute worthwhile service to their community greatly enriches their lives.

For more than 37 years, Experience Works has been a recipient of either SCSEP grants or grants from similar predecessor programs. The Department's yearly grants were all awarded on a non-competitive basis to Experience Works or its predecessor, Green Thumb.

In 1995, the Older Americans Act expired, including its provision authorizing SCSEP. In 2000, Congress passed the Older Americans Act Amendments ("OAA Amendments" or "the Act") and amended SCSEP, Pub.L. 106–501, 114 St. 2267–93. These Amendments codified requirements which had been previously contained in the statutes, regulations, and Program administration materials. They also added a number of new provisions to hold grantees to higher levels of accountability.

Specifically, these provisions require that when a grantee fails to meet the DOL national performance measures, the grantee will be required to submit a corrective action plan. If the grantee fails to meet the DOL national performance measures for a second consecutive program year, the

Secretary shall then conduct a national competition to award up to 25 percent of the grantee's funds on a competitive basis. If the grantee fails to meet the national performance measures for a third consecutive program year, the Secretary shall conduct a national competition to award the remaining amount in the grant. 42 U.S.C. § 30561(e)(2)(D).

On November 8, 2002, the DOL announced a formal Solicitation for Grant Applications ("SGA") for national organizations seeking program grants for Program Year ("PY") 2003, running from July 1, 2003 to June 30, 2004. See 67 Fed.Reg. 68,178–68,200 (Nov. 8, 2002). In that formal solicitation announcement, the Department explained that "holding a full and open competition for SCSEP national grantee funds [would] provide better service to SCSEP participants, host ·agencies, employers and the counties that the national grant program serves." 67 Fed. Reg. 68,178. This was the first time that the Department allocated its SCSEP funds on a competitive basis.

The Department received 68 applications, including one from Plaintiff, by the February 2003 deadline set in the SGA. In its application solicitation, Plaintiff sought a significant expansion from its current funding level of $107.2 million in PY 2002 to a funding level of $255.6 million in PY 2003. Each application was reviewed and scored by a three member review panel. The Department established a competitive range and focused on those organizations that scored 90 or more out of a possible 100 points. The Department then proceeded state-by-state, county-by-county to allocate participant slots, with the highest ranking applicant for a participant county being awarded the slots it had requested for that county.

**2.** The statute does permit service to be provided to profit-making entities, as well.

On May 15, 2003, the Department notified Plaintiff and twelve other organizations that they had been tentatively approved for grants. On May 22, 2003, all current grantees were told by DOL to add to their grant applications contingency plans describing how participants would be transferred to a new grantee if a former grantee lost some or all of its slots.

Plaintiff was ultimately awarded $86.1 million in SCSEP grants for PY 2003, a reduction of $21.1 million from the previous Program Year. Of the 13 grants made, Plaintiff received the highest award, received over $10 million more than the second highest grantee, and received more total grant funds than the eight lowest grantees combined. After some discussions and letters between Plaintiff and DOL, the Department's Grant Officer signed the grant on June 5, 2003. On June 9, 2003, Experience Works filed the present lawsuit.[3]

## II. ANALYSIS

### A. Standards of Review

■■■■ It is undisputed that the granting of preliminary injunctive relief is an extraordinary measure, and that the power to issue such exceptional relief "should be 'sparingly exercised.'" *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C.Cir.1969). The same standards apply for both temporary restraining orders and preliminary injunctions. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). To obtain preliminary injunctive relief, a plaintiff has the burden of demonstrating: "1) a substantial likelihood of success on the merits, 2) that [plaintiff] would suffer irreparable injury if the injunction is not

granted, 3) that any injunction would not substantially injure other interested parties, and 4) that the public interest would be served by the injunction." *Katz v. Georgetown University*, 246 F.3d 685, 687–88 (D.C.Cir.2001). The Court will address each of these requirements in turn.

### B. Irreparable Harm

■■■■ The *sine qua non* of granting any preliminary injunctive relief is a clear and convincing showing of irreparable injury to the plaintiff. In this case, Plaintiff has failed to make that showing. Plaintiff claims both economic harm from the threatened destruction of its ability to effectively deliver services, and damage to its good name and reputation.

Plaintiff has been awarded $86.1 million to carry out its laudable Program for PY 2003. Obviously, this is not the kind of "economic loss that threatens the survival of [its] business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985). There is no question that a $21.1 million reduction in funding is a very serious financial blow to Plaintiff, a blow whose impact the Court does not underestimate. However, the reality is that all applicants for federal funds run this kind of risk of decreased funding. Plaintiff has not suggested that this particular loss in funds, significant as it is, has so devastated its ability to carry out its mission that it will be unable to accept and implement the grant it did receive.

Plaintiff argues that in addition to losing funds, its loss of essential participant slots and geographic areas will greatly compromise the quality and efficiency of its work. Plaintiff argues further that the DOL grant eliminates its operation in several states and significantly reduces operations

---

**3.** The Court again emphasizes that in the interest of time, it has not included many ancillary facts regarding discussions and negotiations amongst Plaintiff, personnel at the DOL and members of Congress.

in 29 other states, thereby "destroying" its service delivery infrastructure. On the basis of this record, the Court cannot reach that conclusion. There has been none of the detailed fact-specific state-by-state and county-by-county evidence, that would be necessary to support such broad change. While Plaintiff may well suffer operational disruptions and inefficiencies, which in turn may affect the qualify of its services, these are simply not the kind of devastating irreparable economic losses that are contemplated under the case law.

As to Plaintiff's concern about damage to its good name and reputation, there is no merit to this argument. Plaintiff contends that it will be perceived to have failed its performance requirements and that it is being punished for that failure. The simple fact is that, as noted above, Plaintiff has received the largest grant awarded by the Department, a grant that far exceeds the next highest grant, and that is far more than the lowest eight grants combined. In light of those facts, Plaintiff cannot demonstrate that its good name and reputation will be compromised. Quite the contrary—on this comparative record, Plaintiff can only be considered the winner in DOL's competitive solicitation.

## C. *Likelihood of Success on the Merits*

█ The legal issue before the Court is straightforward. Do the OAA Amendments of 2000, imposing national performance measures, provide an exclusive procedure for requiring current grantees to compete for future grants, or does the Secretary have authority and discretion to hold a competition for future national grants under the Program, with the possibility that current grantees will suffer a loss of funding from such competition? Plaintiff argues vigorously that Congress intended to protect and preserve the work of high performing grantees—which Plaintiff has been—by requiring compliance with the statute's procedures set up in § 30561(e)(3). The Government, on the other hand, argues that the Secretary has full authority to establish the Program and, as part of such discretionary authority, may open up the entire grant process to a national competition. For the following reasons, the Court concludes that the Government's interpretation of the statute is correct.

1. The Secretary has ample discretionary authority to decide that an open national competition is the appropriate mechanism for making grants under the OAA Amendments. Section 3056(a)(1) authorizes her "to establish an older American community service employment program." *Id.* In order to carry out that Program, she "is authorized to enter into agreements, ... with State and national public and private non-profit agencies and organizations ... to further the purposes and goals of the program." *Id.* Section 3056(d) requires the Secretary to establish "guidelines ... to assure efficient and effective coordination programs under this title." *Id.* In addition, Section 30561 of the Act sets forth a number of criteria upon which the Secretary is to rely in determining which "eligible applicants" are to receive grants to carry out the Program. In short, the language of the statute gives the Secretary ample discretion to make program grants on the basis of a national competition.

· 2. Significantly, there is absolutely no prohibition in the OAA Amendments against awarding grants on a competitive basis. Nor do Plaintiffs point to any such provision in the statute.

3. Plaintiff's strongest argument is that, because the 2000 Amendments added provisions explicitly permitting a national competition when grantees failed to live up

to national performance measures, the Secretary has no such authority to require a national competition for awarding new grant funds when Congress has not explicitly authorized it. While it is clear that Congress intended to make grantees more accountable for the manner in which they carried out their programs, there is absolutely nothing in the statute which precludes the Secretary from using a national competition to decide, under the appropriate criteria set forth in Section 30561, who is the best qualified to receive PY 2003 grants. The use of competitive procedures is a time-honored method for obtaining the most highly qualified awardees of government funds, for allowing new and innovative ideas and organizations to receive those funds, and for assuring public confidence in the integrity of the process to distribute government funds.

4. What Plaintiff is arguing for is in essence an absolute entitlement to the continuation of its existing grant as long as the Department does not find under Section 30561(e)(1) that it has failed to meet the national performance measures established pursuant to Section 3056k(a)(1). Neither the statute nor the cited legislative history supports such a claim. Section 3056d(a)(3) of the Act expressly reserves appropriation funds on an annual basis for "Indian aging organizations and Pacific Island and Asian–American aging organizations." However, there is no such reservation or set aside of funds for high performing current grantees.

5. What is significant in terms of the legislative history is that prior to the OAA Amendments of 2000, Section 3056d(a)(1)(C) did contain an explicit provision for "[p]reference in awarding grants and contracts under this paragraph ... to national organizations and agencies of proven ability in providing employment services to eligible individuals under this program and similar programs." *Id.* However, when the OAA Amendments were adopted in 2000, this language was omitted. Whatever the extent of "preference" that existed for certain organizations prior to 2000, that "preference" was deleted from the 2000 Amendments.[4]

5. In *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., et al,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court set forth the appropriate analysis for "[w]hen a court reviews an agency's construction of the statute which it administers." At step one, the court must ask "whether Congress has directly spoken to the precise question at issue." *Id.* As already noted, in this case Congress has not specifically addressed the issue of allowing a national competition for new grantees, although it has provided the Secretary substantial authority to establish the SCSEP program and administer it so as to further its purposes and goals. At step two, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's [interpretation] is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. In answering that question, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted ..., or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. 2778. *Chevron* requires that a highly deferential standard of review "be accorded to

---

4. While the precise scope of that "preference" may not be clear, it is hard to believe that it amounted to an indefinite entitlement to annual funds as long as performance measures were met, as Plaintiff argues. In any event, given the fact that the 2000 Amendments do not contain this "preference," its precise contours need not be determined at this time.

an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844, 104 S.Ct. 2778. For all the reasons spelled out above, the Court concludes that the Department's choice of a national competition for PY 2003 grants was a "permissible" interpretation of § 3056 of the Act.

6. Plaintiff has submitted numerous exhibits purporting to show Congress' intent to shield high performing grantees from a competitive process. Without going through each of these exhibits page-by-page, the Court takes note of their general unpersuasiveness. Some of the exhibits are post-enactment letters from Senators and Congressman to the DOL expressing concern about the competitive process. Apart from the fact that these letters primarily focus on allowing sufficient time for transition from one grantee to another, they are of no legal relevance in determining legislative intent. *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 3, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *United States v. Knox*, 32 F.3d 733, 749 n. 14 (3d Cir.1994). Other exhibits contain statements made on the floor of the Senate during debate on a different provision of the OAA Amendments which was never adopted. Finally, Plaintiff offers some language from a FY 2002 Supplemental Appropriations Conference Committee Report, which was not included in subsequent appropriation bills.

## D. *Injury to Others*

■ Plaintiff raised, as part of its irreparable injury argument, the disruption of its program and the resulting injury to the senior citizens who are participants in the program. That is a legitimate concern and one on which the Court focused at oral argument. If there is any irreparable injury flowing from the Department's national competition, it will be to the vulnerable elderly who count on this program to supplement their poverty level incomes and as a meaningful addition to their lives. Any irreparable injury, however, would be to the participants in the Program, not to Plaintiff.

The Department of Labor has assured the Court in written pleadings and at oral argument that "[n]o participant will automatically lose his or her job, or lose a paycheck, nor will a community be deprived of a participant's services as a result of a new grantee being put in place to serve a given locality." Benedict Decl., ¶ 10, Benedict Statement at Motions Hearing. While the Court has serious concerns about whether the Department will be able to meet this goal, this record does not provide a basis for finding, by either a preponderance of the evidence or clear and convincing evidence, that the Department will not. The Department has described in its various declarations the transition process, and has spelled out the degree to which other grantees would be irreparably injured were injunctive relief to be granted. For example, other FY 2003 grantees have already spent their own funds (which might not be reimbursable if they were to now lose their funding) on obtaining appropriate space for their programs, on hiring, on purchasing equipment, supplies, and furniture, etc. Administrative costs will also be higher for these grantees. Perhaps most importantly, were this Court to enter injunctive relief at this time—with the transition half completed—there would be great disruption and uncertainty in the administration and implementation of a program which is so important to the elderly, poor, disabled and frail individuals who are participants in it. In short, to grant injunctive relief now, would worsen and further confuse the situation.

## E. *The Public Interest*

The public interest would be served by permitting this Program to go forward in the most orderly and organized manner.

For the reasons already discussed, the Court concludes that the denial of injunctive relief will serve that purpose.

## *ORDER*

Plaintiff, Experience Works, Inc., is a not-for-profit organization which offers training, employment, and community service opportunities for older workers. It seeks, in this action, to enjoin the Department of Labor ("DOL" or "the Department") from completing its current grant-making cycle for the Community Service Employment Program ("the Program" or "SCSEP") authorized by the Older Americans Act, 42 U.S.C. § 3056, for Program Year 2003.

Upon consideration of the Plaintiff's request for a Temporary Restraining Order and/or a Preliminary Injunction, the Department's Opposition, the numerous declarations and exhibits submitted, the lengthy oral argument and applicable law, it is hereby

**ORDERED,** that Plaintiffs' request for a Temporary Restraining Order and/or Preliminary Injunction is **denied**.