**FEDERATION INTERNATIONALE DE FOOTBALL ASSOCIATION Plaintiff,**

v.

**NIKE, INC., Defendant.**

**No. CIV.A. 03–2003(ESH).**

United States District Court, District of Columbia.

Oct. 2, 2003.

James L. Bikoff, Silverberg, Goldman & Bikoff, LLP, Washington, DC, for Plaintiff.

Warren E. Olsen, Fitzpatrick, Cella, Harper & Scinto, Washington, DC, for Defendant.

### MEMORANDUM OPINION

HUVELLE, District Judge.

The 2003 Women's World Cup soccer tournament is currently under way in venues across the United States. The tournament began on September 20 and is scheduled to end on October 12. In connection with this event, its organizer, the Federation Internationale de Football Association (FIFA), sought to register the trademark "USA 2003." Claiming that Nike's use of a similar phrase ("USA 03") in connection with its sponsorship of the U.S. Women's National Soccer Team has infringed upon that trademark and amounts to unfair competition, tortious interference with contractual relations, and breach of contract, FIFA brought the present action. Plaintiff has now moved for a Temporary Restraining Order enjoining Nike from using the phrase "USA 03" on its websites, or in connection with any soccer-related goods and services, during the duration of the World Cup. Nike has requested that the Court transfer this action to the Southern District of New York, or at least stay its decision until that court rules on a declaratory judgment action that Nike has brought against FIFA. *See Nike, Inc. v. FIFA,* Civ. Act. No. 03–7467 (S.D.N.Y. Sept. 24, 2003). For the reasons that follow, the Court will decline to transfer or stay the case at this time, and on the merits, it will deny plaintiff's request for a TRO.

### BACKGROUND

The Women's World Cup has been played every four years since 1991. The current tournament was originally scheduled for China, but concerns about the recent SARS outbreak caused FIFA to move the matches to the United States, where the successful 1999 tournament had been held. In preparation for this event, as it had for previous World Cups, FIFA sought to register a number of trademarks, including one reflecting the name of the host country and the year. Thus, after the change in venue, three trademark applications for the phrase "USA 2003" were filed with the U.S. Patent and Trademark Office (PTO); these applications are currently pending. Plaintiff has entered into licensing agreements with various sponsors of the World Cup, including the sporting goods manufacturer Adidas, which allow those companies to use FIFA's trademarks on merchandise and services related to the tournament.

Defendant Nike is not a World Cup sponsor, and has no contract with FIFA to use the latter's marks in connection with the 2003 event. Nike is, however, the sponsor of the U.S. Women's National Soccer Team, which won the 1999 World Cup and is playing in the current competition. Nike provides the team's uniforms, which prominently bear the company's famous Swoosh logo, as well as other equipment and clothing. Moreover, and of direct relevance here, Nike has designed a logo that combines the Swoosh with the phrase "USA 03." This logo has been featured in various places, including on a website owned by the company, *www.usasoccer.com,* as well as on limited-edition t-shirts and sweatshirts that have now been distributed to approximately 100 stores around the country. (On some of this merchandise, Nike actually uses a different phrase: "United States 2003.") According to Nike, this website was developed to give fans of the U.S. soccer team a chance to follow the players and the team as they travel and train. (Decl. of Elizabeth Valentine ¶ 5.) Although the Nike site only went active shortly before the World

Cup began, it shows no pictures, and makes no mention, of either that event or to FIFA itself. And the shirts feature only the aforementioned logo, sometimes along with the soccer team emblem, and other than using the phrase "USA 03" (or "United States 2003"), they contain no reference to FIFA or to the World Cup.

On September 11, 2003, after FIFA learned that Nike had been using the "USA 03" phrase on its website, it sent a cease-and-desist letter accusing Nike of trademark infringement. This triggered several exchanges of correspondence in which the parties set forth their positions in an effort to resolve the dispute short of litigation. These efforts came to an end on September 24, when Nike filed a action in the United States District Court for the Southern District of New York, seeking a declaratory judgment that its use of "USA 03" did not amount to trademark infringement under either federal or state law. (Decl. of Tila Duhaime, Ex. A.) Two days later, on September 26, FIFA filed the present action in this Court. Plaintiff's complaint asserts six counts—including trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), trademark dilution in violation of the Federal Trademark Dilution Act (FTDA), 15 U.S.C. § 1125(c), tortious interference with contractual and economic relationships, and breach of contract. Plaintiff also moved for a TRO. In response, Nike filed a motion to transfer this case to the Southern District of New York, or, in the alternative, to stay the present action until that court acts on Nike's complaint. This Court heard oral arguments on these motions on September 29.

## ANALYSIS

Before turning to FIFA's motion, the Court must first consider Nike's argu-ment that the Court should transfer this case to the Southern District of New York, where Nike has filed its declaratory judgment action. It is true that when parties sue each other in different federal courts, one for trademark infringement and the other for a declaratory judgment, the so-called 'first-to-file rule' generally dictates that "the first-filed declaratory judgment suit be given priority and [be] allowed to continue." McCarthy on Trademarks and Unfair Competition § 32.46 (4th ed.). When this rule is heeded, the later-filed infringement action will typically either be dismissed or transferred to the forum hearing the declaratory judgment. *See, e.g., 800–Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128 (S.D.N.Y. 1994). The rule, however, is not absolute, and "special circumstances" can justify exceptions to it. *Id.* at 132; *see also Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002, 1005 (8th Cir.1993) (noting that the rule is not intended to be "rigid, mechanical, or inflexible" and can be relaxed in "compelling circumstances").

Such circumstances include where the first-filing plaintiff has launched a "preemptive strike" declaratory judgment action in the face of an impending infringement suit. *See Al–Or Int'l Ltd. v. Paul Morelli Design Inc.*, 53 U.S.P.Q.2d 1191, 1194–95 (C.D.Cal. Nov.30, 1999); *Galileo Int'l P'ship v. Global Village Communication, Inc.*, 1996 WL 452273, at *3 (N.D.Ill. Aug. 8, 1996) ("But where a declaratory judgment action is filed in anticipation of an infringement action, the infringement action should proceed, even if filed later."); *Serco Servs. Co. v. Kelley Co.*, 1994 WL 715913, 31 U.S.P.Q.2d 1795, 1797 (N.D.Tex. May 24, 1994) (holding that where the declaratory judgment action is an "anticipatory suit," the first-to-file rule is trumped). Other factors that militate against the rule are that the first action was filed in the midst of good faith settle-

ment discussions, and that the two suits were filed closely together in time and neither has progressed very far. *See Paul Morelli*, 53 U.S.P.Q.2d at 1194–95; *Global Village*, 1996 WL 452273, at *3. Finally, the fact that a motion requiring expedited consideration has been filed only in the infringement action, and that precious time would be lost if that motion had to be refiled in the other court, argues in favor of allowing the second-filed action to proceed. *See Global Village*, 1996 WL 452273, at *3.

■ Each of these considerations leads this Court to deny defendant's motion for a transfer or a stay, at least for the time being, and act upon plaintiff's request for a TRO. There can be little doubt that Nike filed its suit in immediate anticipation of being sued by FIFA. In its last letter to Nike before the race to the courthouse began, FIFA's counsel wrote: "my client feels that it has no alternative but to seek the protection of the courts to protect its rights from further damage, unless we can find an immediate solution." (Nike's Mot. to Transfer, Ex. 7.) That letter closed with a warning: "If we do not receive the relevant information from Nike within that deadline [24 hours], my client has instructed me to inform you that it will initiate formal proceedings against Nike without further notice." (*Id.*) This letter was sent on September 23; the very next morning, Nike filed its declaratory judgment action in New York. Given FIFA's looming deadline, this plainly appears to have been a "preemptive strike." Moreover, the New York action is in its earliest stages; there is no indication that FIFA has filed an answer or responded in any other way to Nike's complaint. Finally, given that the World Cup has but less than two weeks to

go, and that this action could largely become moot once the final whistle is heard, FIFA's motion for a TRO is extremely time-sensitive. Thus, granting Nike's motion would result only in unnecessary, and possibly prejudicial, delay.

■ Accordingly, the Court will now address the merits of FIFA's motion. A TRO is an extraordinary remedy and should not be granted lightly. *See Experience Works, Inc. v. Chao*, 267 F.Supp.2d 93, 96 (D.D.C.2003); *see also FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C.Cir. 1980). The standard for deciding whether to do so is well-established. The moving party has the burden of showing: (1) a substantial likelihood of success of the merits; (2) that it would suffer irreparable injury in the absence of such relief; (3) that the TRO would not substantially injure other interested parties; and (4) that the public interest would be served if the TRO is granted. *See id.* (citing *Katz v. Georgetown Univ.*, 246 F.3d 685, 687–88 (D.C.Cir.2001)). FIFA has not met that burden here.

■ In most trademark actions, the most important factor is the likelihood of success, and this case is no exception. Given plaintiff's acknowledgment at the TRO hearing that its strongest legal arguments arise from its Lanham Act claims for trademark infringement and unfair competition, the Court addresses those claims first.[1] The threshold question in any infringement action is whether the plaintiff has a "valid mark entitled to protection." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir.1993). This is a function of the mark's distinctiveness, an inquiry facilitated by the heuristic of placing marks into one of

1. At the hearing, plaintiff essentially abandoned its breach of contract claim as a basis for obtaining a TRO. (Tr. 9/29/03, at 37.)

four general categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary or fanciful. *See Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C.Cir.1989); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976) (Friendly, J.). There can be little question that the mark at issue here is descriptive, that is, one that "directly describe[s] a particular quality, function, or characteristic of a product or service." *Blinded Veterans*, 872 F.2d at 1039–40. "USA 2003" simply identifies the country in which the World Cup is being played along with the year in which the event is taking place. *See Metromedia, Inc. v. Am. Broad. Cos.*, 1980 WL 30215, 210 U.S.P.Q. 21, 23–24 (S.D.N.Y.1980) (holding that the mark "Rocktober" to describe a rock music event held during the month of October was descriptive "because it merely sets forth the composition or ingredients of the service").

As a descriptive mark, "USA 2003" is "not inherently distinctive," *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), and thus is entitled to protection only upon proof that it has acquired secondary meaning, that is, "proof that the public recognizes only one source of the product or service." *Blinded Veterans*, 872 F.2d at 1040; *see also Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (secondary meaning established where, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself"); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 283 n. 10 (3d Cir.2001) ("A mark is descriptive with a secondary meaning when the mark is interpreted by

the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services.") (internal quotation marks omitted); *Gruner + Jahr*, 991 F.2d at 1076 (defining secondary meaning as "an identity that consumers associate with a single source").

■ The burden falls on plaintiff to establish secondary meaning. *See Secular Orgs. For Sobriety, Inc. v. Ullrich*, 213 F.3d 1125, 1130 (9th Cir.2000). While there is no firm consensus as to how this is done, the factors that typically are considered include the extent of advertising that endeavors to link the mark with plaintiff's specific goods and services, the length and exclusivity of use, customer survey evidence, the use of the mark in trade or other specialty journals, the size of the company, and the volume of sales associated with the mark. *See Commerce Nat'l Ins. Services, Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir.2000); *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985); McCarthy § 15.30 (noting that secondary meaning can be proven with both direct and circumstantial evidence, and listing relevant factors).

Here, FIFA has offered essentially no competent evidence that would tend to demonstrate that the "USA 2003" has acquired the kind of secondary meaning that is a prerequisite to its protection as a valid trademark.[2] There has been no evidence as to the amount of advertising done, or the quantity of goods and services sold, under the mark, and thus no circumstantial evidence to reveal how familiar the public has become with the mark and how likely they are to draw connections between the mark and FIFA's World Cup

---

2. As plaintiff's counsel conceded during oral argument: "Secondary meaning is not some-

thing we can prove to you today." (Tr. 9/29/2003, at 34.)

tournament. *See* McCarthy § 15.48 (noting that such evidence is the "easiest and least expensive manner of proving secondary meaning"). And certainly no direct evidence has been introduced, whether in the form of surveys or affidavits, regarding consumer attitudes towards, and associations with, the "USA 2003" mark. While FIFA puts much stock in the fact that it has used and registered country-name-plus-year-of-event marks for its previous World Cups (Decl. of Thomas Houseman ¶ 3), that alone does little to prove that even soccer fans would automatically associate "USA 2003" with this year's Women's World Cup. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987) (noting that even though the mark owner may strive to create secondary meaning, "it is the consuming public which, in effect, determines whether that effort has succeeded."). Indeed, because FIFA has offered nothing to show that these previous efforts have actually created secondary meanings, this historical practice does little to demonstrate the success of its efforts to do so here.[3]

Finally, while plaintiff has submitted exhibits showing how the mark has appeared on various merchandise offered for sale to the public, these exhibits do not help plaintiff's case, because they reveal that FIFA does not use the phrase "USA 2003," in isolation, to refer to the 2003 Women's World Cup. Rather, in each of these examples, the phrase appears as part of a composite logo, which usually includes the words "FIFA Women's World Cup," and *always* includes the same graphic element, which is a stylized depiction of the tournament trophy. (Pl.'s Mot. for TRO, Ex. 4.)[4] The phrase is always in the same font, an horizontally elongated sans serif. Moreover, on those occasions where the country name and year appear alone with the

---

3. FIFA relies heavily on a 1999 decision of the PTO's Trademark Trial and Appeal Board (TTAB) in which the Board refused to register the trademark "SYDNEY 2000" to an individual not affiliated with the Olympic Games scheduled to take place in Sydney, Australia in 2000. *See In re Urbano*, 1999 WL 696010 (Trademark Tr. & App. Bd. May 12, 1999). There are several reasons why this decision is of little help to plaintiff here. First, and most obviously, the opinion has no precedential value in this Court, and is entitled to no deference. More importantly, while *Urbano* suggests that the International Olympic Committee has successfully created some consumer association between its city/year-date marks and specific Olympiads, nothing in that decision so much as hints that FIFA has enjoyed comparable success in connection with its World Cup events. And, as discussed herein, the problem in plaintiff's case is less abstract and legal (whether country/year-date marks are capable of being trademarked) than it is specific and factual (whether FIFA has offered sufficient evidence that this particular country/year-date mark has acquired sufficient distinctiveness to warrant trademark protection). Finally, insofar as plaintiff is trying to use *Urbano* to imply that the PTO is on its side on this broader legal issue, more recent—and more relevant—events cast serious doubt on that implication. Indeed, in two of FIFA's latest applications for trademarks involving a country name along with a year-date—for this year's Women's World Cup in its original Chinese location ("China 2003") and for the next Men's World Cup ("Germany 2006")—the PTO specifically requested that FIFA disclaim those phrases apart from the overall stylized mark. (Nike's Mot. to Transfer, Ex. 8.) This may suggest a significant skepticism on PTO's part regarding FIFA's right to assert full trademark protection for the unadorned combination of a host country name and year-date. As such, insofar as PTO's actions are relevant here, the trend within that agency hardly bolsters—and seems in fact to weaken—plaintiff's attempt to use the Lanham Act to block Nike from using "USA 03" as part of its soccer marketing strategy.

4. A typical example of FIFA's use of "USA 2003" and Nike's use of "USA 03" is attached to this Memorandum Opinion.

graphic, the two elements are incorporated in a particular way: one of the lines forming the trophy is extended to envelop the words "USA 2003" in a kind of grooved rectangle. This distinctive usage cuts strongly against plaintiff's assertions that the phrase alone is likely to have become so strongly linked with the Women's World Cup that the public would inexorably associate the one with the other. Whatever associations consumers may have formed with the visually striking logo do not necessarily attach to the bare words if isolated from the graphical context in which they have invariably been presented. And without having adduced any evidence that the public is likely to have made this rather significant leap, plaintiff has very

little chance of prevailing on the merits of their trademark infringement and dilution claims. *Accord Ralston Purina Co. v. Thomas J. Lipton, Inc.* 341 F.Supp. 129, 134 (S.D.N.Y.1972) ("Proof of secondary meaning entails rigorous evidentiary requirements.").

▆▆ Even assuming arguendo that plaintiff could somehow overcome this secondary meaning hurdle, the next obstacle would be likelihood of confusion, which is a key element of any infringement or § 43 unfair competition claim.[5] *See Bird v. Parsons,* 289 F.3d 865, 877 (6th Cir.2002). It is plaintiff's burden to establish this element by showing that "numerous ordinary prudent purchasers are likely to be

---

5. In contrast, likelihood of confusion is not an element of a dilution claim under the FTDA. *See Moseley v. V. Secret Catalogue, Inc.,* 537 U.S. 418, 123 S.Ct. 1115, 1122, 155 L.Ed.2d 1 (2003). Rather, the Act specifically defines "dilution" to mean "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of ... likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. However, given that plaintiff is unlikely to succeed in establishing the distinctiveness of its "USA 2003" in the context of an ordinary infringement claim, it has even less hope of proving that the mark is "distinctive and famous," as required to prevail on a dilution claim. 15 U.S.C. § 1125(c)(1).

Even were the Court to assume that the mark had acquired sufficient distinctiveness for purposes of an infringement action, this is certainly not enough under the FTDA. *See Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 876–77 (9th Cir.1999) (holding that the FTDA "requires a showing greater than distinctiveness to meet the threshold element of fame"); *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 46–47 (1st Cir.1998) (because a "famous" mark must be "truly prominent and renowned," the mere acquisition of secondary meaning is "nowhere near sufficient" to come within the FTDA). And here there is no evidence at all regarding several of the factors articulated by Congress as bearing on famousness: the extent of use of the mark; the extent of advertising and publicity; the degree of

recognition of the mark in the trading areas and channels used by its owner; and the nature and extent of use of the same or similar marks by third parties. *See id.* at § 1125(C)(1)(B), (C), (F), (G). And even where there is evidence—such as to duration of use—it is hardly helpful to plaintiff. The mark has been used only since July or August, and it is hard to imagine this length of use and publicity would be sufficient to engender a sufficiently famous mark. Moreover, it has even been persuasively suggested that, in enacting the FTDA, Congress did not intend to confer the Act's broad antidilution protections on descriptive marks (such as "USA 2003") at all. *See TCPIP Holding Co. v. Haar Communications Inc.,* 244 F.3d 88, 93–98 (2d Cir. 2001).

The Court therefore has little trouble concluding that plaintiff has minimal hope of succeeding on its dilution claim. There is ultimately nothing in FIFA's submission that "would enable a court to determine the extent or dimension of public recognition of the mark and whether it has fame sufficient to meet the requirement of the Act." *Haar,* 244 F.3d at 99–100; *see also Best Cellars, Inc. v. Wine Made Simple, Inc.* 2003 WL 1212815, at *18 (S.D.N.Y. March 14, 2003) (dismissing dilution claim where plaintiff did not show either a national advertising campaign focusing on the allegedly famous mark or any evidence that the mark had become well-known to a broad spectrum of the public).

72

misled or confused as to the source of the product in question because of the entrance in the marketplace of the defendant's mark." *Gruner + Jahr*, 991 F.2d at 1077; *see also Malarkey–Taylor Assocs., Inc. v. Cellular Telecommunications Indus. Ass'n*, 929 F.Supp. 473, 476–77 (D.D.C.1996).

■ The standard test for likelihood of confusion is the one articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). *Basile S.p.A. v. Basile*, 899 F.2d 35, 37 (D.C.Cir.1990). Under *Polaroid*, the Court is to consider the following non-exhaustive list of factors: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the proximity of the products being sold; (4) the likelihood that the plaintiff will 'bridge the gap' between the products being sold; (5) evidence of actual confusion; (6) defendant's good faith in using the mark; (7) the quality of defendant's products; and (8) the sophistication of the relevant consumer market. *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir.1996). In applying these factors, it is crucial to consider how plaintiff's mark is actually *used* in commerce. *See Ludden v. Metro Weekly*, 8 F.Supp.2d 7, 12 (D.D.C.1998) (noting that the "touchstone of trademark law is use"). Accordingly, the fact that FIFA has attempted to register "USA 2003" by itself is irrelevant to this inquiry; what matters is how plaintiff has presented that mark to the public. *See Basile*, 899 F.2d at 37 n. 1 ("[T]he underlying right depends not on registration but rather on use"). Looking at such use is the only way to determine whether Nike's rival use is in fact likely to cause confusion.

■ First, as to strength, even if it is assumed that "USA 2003" has taken on secondary meaning, there is little to suggest that the mark is a particularly strong one. As discussed above, plaintiff has adduced virtually no evidence, direct or otherwise, indicating the degree of consumer association between that mark and the 2003 Women's World Cup. Moreover, as a general matter, descriptive marks are weaker—and "command[ ] a lesser degree of protection"—than arbitrary or fanciful marks. *Haar*, 244 F.3d at 101 (holding that "The Children's Place" was a "weak, descriptive mark"). This is particularly true where—as is surely the case here— the words making up the mark are in the public domain and have been extensively used by third parties in other marks. *See Gruner + Jahr*, 991 F.2d at 1078. Indeed, given the descriptive generality of the overlapping words here ("United States" and "2003"), the similarity between the marks would likely lead consumers to expect not that they identify the same source, but rather that "the similar marks were chosen because they describe similar, desirable attributes of the products," *i.e.* that they are associated with the United States and with the present year. *Haar*, 244 F.3d at 101. This diminishes the possibility that consumers will be confused as to the origin of the goods connected with each mark, and argues against finding that Nike has violated the Lanham Act.

■ The next factor is similarity. While the words used by both plaintiff and defendant are obviously quite similar, the marks actually presented to consumers differ in significant ways, as the attachment hereto demonstrates■ "In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found." *Gruner + Jahr*, 991 F.2d at 1078. Thus, even after a

descriptive term has become distinct, its power to preclude other uses of closely related descriptive terms is diminished where the senior owner has used its mark only in a particular, stylized way. For even if that overall stylized mark is strong, the trademark value of the words themselves may be quite weak. And when another seller uses those words in a different graphical context, the expected likelihood of confusion is minimal. *See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090–91 (10th Cir. 1999) (holding that two marks using the same two words in very different graphical arrangements were not similar); *Gruner + Jahr*, 991 F.2d at 1078 ("Any presumption of distinctiveness for likelihood of confusion purposes is lessened by the dissimilarity of the two magazine logos before us."). This is exactly the case here.

As discussed above, FIFA has only used "USA 2003" as part of a composite logo, with a distinct font and graphical element. Moreover, the phrase usually appears next to the words "FIFA Women's World Cup." Thus, because FIFA has not used its "USA 2003" mark in a way that would lead consumers to associate those words *alone* with this year's World Cup, the organization is in a much weaker position to stop others from using similar words (either on their own or in graphical arrangements different from those used by FIFA) to sell soccer-related merchandise. And Nike's "USA 03" mark is indeed used differently; it appears in a different font (usually a vertically elongated sans serif) and always adjacent to the company's famous Swoosh. (Nike's Mot. to Transfer, Ex. 2.) It has not been displayed with any graphic other than the Swoosh, except the logo of the U.S. Women's National Soccer Team, which is not owned by or connected with FIFA. Moreover, the evidence before the Court indicates that "USA 03" has been used only in connection with images of players on that team, and not in ways that would directly link that phrase with either FIFA or with the 2003 World Cup. These dissimilarities cut substantially against FIFA's infringement claims.[6]

Several of the remaining factors also benefit Nike. Plaintiff has presented no evidence to suggest any actual consumer confusion. Nor has there been any suggestion that Nike's products are inferior. This leaves the question of good faith. Nike argues that its use of "USA 03" (or "United States 2003") is innocent, given the company's sponsorship of the Women's National Team. After all, the team that Nike is backing is the United States team for the year 2003, and therefore, "USA 03"

---

**6.** On September 30, 2003, plaintiff faxed pictures to the Court of the t-shirts and sweatshirts that Nike has now begun selling featuring the "USA 03" and "United States 2003" marks. This was the first time that the Court had seen these images; at the hearing, defendant's counsel could only describe the shirts verbally. (Tr. 9/29/03, at 57–58.) While they do not ultimately change the Court's decision, the Court is troubled by what appears to be Nike's gamesmanship in designing some of this merchandise. The graphic used on these shirts is not the simple "USA 03" displayed on the company's website. Indeed, the font used for the word "2003" on certain of the shirts now appears quite similar to the distinctive font that FIFA has used. Moreover, the shirts that include the similar font also seem to have excised the National Team logo, and indeed any other reference to the team itself. Given Nike's representation that its sponsorship of the team is what lead it to produce these items in the first place, the Court finds this absence striking, and somewhat troubling. This problem is not helped by the fact that Nike has superimposed its new mark upon what appears to be a soccer ball. While FIFA still has secondary meaning and strength of mark problems that preclude it from receiving a TRO, it is certainly the case that plaintiff's position is stronger with respect to some of the shirts that the company has now offered for sale.

is an appropriate and understandable way for Nike to associate itself with that group of players. The Court agrees that Nike's preexisting and entirely legitimate relationship with the Women's World Cup provides an important context for its use of the disputed marks. For there can be little doubt, in light of the success that the U.S. women enjoyed in the 1999 World Cup, that the team and the event are already linked in the public mind. As such, Nike's careful use of a mark that might be affiliated with both is not necessarily an indication of bad faith, but instead of savvy marketing. Whenever that team plays in this country, it is to be expected that the sponsors of both the team and the event would want to use trademarks that reflect the United States and that emphasize this year's date. Nike's doing so here thus may not indicate a deliberate attempt to deceive the buying public. As such, the Court concludes that defendant's display of "USA 03" on its website and on some of its recently retailed shirts was likely done in good faith.[7]

To be sure, other factors do lean in FIFA's favor. The products being sold under the two marks are quite similar (all are items connected to soccer or of primary appear to soccer fans). And plaintiff has already bridged the gap between its primary product (the World Cup itself) and the products sold by Nike (sports-related merchandise). Nevertheless, in the context of the overall *Polaroid* analysis, these factors are significantly outweighed by those suggesting that no serious confusion will result from Nike's use of the "USA 03" mark. Based on its weighing of these elements, the Court concludes that FIFA is unlikely to prevail on those claims that depend upon a likelihood of consumer confusion.[8] And because plaintiff's one trademark cause of action that does not turn on this issue seems destined to fail for different reasons (*see supra*, note 5), the Court concludes that plaintiff's Lanham Act claims are not likely to succeed. There is thus no basis on which to impose a Temporary Restraining Order.[9]

## CONCLUSION

For the reasons stated above, the Court has denied without prejudice to being renewed later, defendant's Motion to Transfer, or in the Alternative, to Stay.

7. That said, the ultimate conclusion may be different as to those items of clothing sold by Nike that use a font similar to FIFA's and lack any references to the U.S. Women's Team. These more misleading shirts seem to deliberately create ambiguity about their origin, rather than merely to exploit certain connections between the team and the World Cup that may already exist. As such, Nike's distribution of these items could suggest a lack of good faith on its part.

8. Included among the claims dependent upon a showing of confusion is plaintiff's allegation that Nike's use of "USA 03" falsely suggests a connection with FIFA as an "institution." *See* Lanham Act § 2(a), 15 U.S.C. § 1052(a).

9. While the Court has not previously discussed FIFA's tortuous interference claim, this claim also provides no basis for temporary injunctive relief, as plaintiff has not demonstrated that it would suffer any irreparable harm from Nike's alleged misdeeds. The harm to which plaintiff alludes in this context is entirely speculative, based as it is on the suppositions (for which no evidentiary foundation has been provided) either that FIFA's current sponsors will refuse to pay off the balance of their contracts because of Nike's actions or that those actions will make it more difficult for FIFA to attract paying sponsors in the future. (Pl.'s Mot. for TRO, at 13.) The Court sees no reason why these harms, should they arise, would not be fully compensable with monetary damages. As such, a TRO is not the appropriate mechanism with which to address the harms identified by plaintiff. *See Davenport v. International B'hood of Teamsters, AFL–CIO*, 166 F.3d 356, 367 (D.C.Cir.1999).

However, on the merits, it has also denied plaintiff's Motion for a TRO.

### ORDER

For the reasons stated in the Court's Memorandum Opinion, it is hereby

**ORDERED** that defendant Nike's Incorporated Motion to Transfer or, in the Alternative, to Stay is **DENIED WITHOUT PREJUDICE**; and it is

**FURTHER ORDERED** that plaintiff FIFA's Motion for a Temporary Restraining Order is **DENIED**.

**IT IS SO ORDERED.**